[See Cases Nos. 6,980 and 6,982.]

## Case No. 6,982.

### HYLTON v. BROWN.

[1 Wash. C. C. 343.] [1]

Circuit Court, D. Pennsylvania. April Term, 1806.

EJECTMENT — PRODUCTION OF PAPER TO DEFACE PLAINTIFF'S TITLE — WHAT PREVIOUS EVIDENCE OF DEFENDANT NECESSARY — PROOF OF WILL — ATTAINDER — RIGHT TO ATTACK IN COLLATERAL ACTION — OPERATION OF TREATY BEFORE RATIFICATION.

1. The court, upon the authority of an adjudged case, not cited in a former trial, admitted that the defendant had a right to insist upon the production of a paper, which went to deface the plaintiff's title, without fortifying his own; contrary to a decision in the former trial of this case.

2. Although a paper has been produced by one party on notice from the other, it does not become evidence, unless from its legal character it is entitled to be such.

3. An original will of lands, not proved according to law, cannot be read in evidence; although produced on the notice of the opposite party, as the will of the person named in it.

4. A party who claims lands against an attainder, the correctness of which he denies, could not, upon the principles of the common law, controvert the title of the purchaser under the attainder, in a collateral action; but would be compelled to reverse the attainder, and thus obtain a judgment of restitution.

5. The principles and provisions of the laws of Pennsylvania, in relation to attainders, examined.

6. The operation of a treaty, before ratification by the governing powers of the state, by whose agents it has been signed.

This cause, which was tried at the adjourned court, in January [Case No. 6,981], and in which a venire de novo was awarded, came on now to be tried again. The evidence was the same as at the former trial. The defendant, having stated and shown his possession and title, called for the produc-

---

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

tion of the will of Joseph Griswold, after proving a notice to the plaintiff to produce it, and also that it was in his possession. In addition to the cases formerly cited and relied on, Metcalf v. Hervey, 1 Ves. Sr. 248, was now read; in which Lord Hardwicke determined, that a defendant in possession, whether rightfully or tortiously; and being sued in ejectment, might call upon the plaintiff in equity, to set out his title, that it might be seen whether the title was not in some other person than himself. The plaintiff's counsel endeavoured to explain this case, by saying, that this only meant, that the defendant at law, might seek this discovery, to enable him, at the trial, to be prepared, and to show, if he could, that the title was out of the plaintiff. That, at any rate, the case did not authorize the defendant in this case, to compel the plaintiff to do more than he had already done, i. e. to set forth his title; but this was a different thing from compelling the plaintiff to exhibit evidence to defeat his title, without strengthening that of the defendant. They cited, in addition to the cases formerly read, the following: Hind, Prac. 36; Mitf. Eq. Pl. 52, 138, 100, 162, 215, 98, 160, 161; 2 Ves. Sr. 445; 2 Fonbl. 482, 484, 487; 3 Ves. 222, 243; 1 Wood. El. Jur. 207; 2 Ves. Sr. 189; 2 Atk. 393, 392. The defendant cited Mitf. Eq. Pl. 160, 161; Parker, 144; 1 Ves. Jr. 56.

PETERS, District Judge, thought, that upon reason and principle, the decision given on this point, at the former trial, was right; but he yielded to the express authority now read, of Metcalf v. Hervey.

WASHINGTON, Circuit Justice. The doctrine laid down in 2 Fonbl. 484, in the note, coincides entirely with my opinion on this point; but the case of Metcalf v. Hervey, is an authority binding upon us, and is too strong to be got over. The explanations, which have been attempted to be made of this case, are ingenious, but not satisfactory. That was to every purpose a bill of discovery, and was entertained as such by the judge; it was brought by a person not claiming title; and it called upon the defendant for a discovery, which could not be necessary to protect the possession of the defendant; but merely to defeat the claim of the plaintiff at law. If the heir of Mrs. Harmer should be found to be really entitled, the effect of the bill was merely to show, that the title was out of the plaintiff, and furnished the defendant with a defence against the plaintiff at law; but without affording validity to his title. What is the present case? The defendant calls upon the plaintiff to exhibit a paper in his possession, pertinent to the issue, in order to prove the title out of the plaintiff. There is no distinguishing the cases. But it is said, that the case only warrants the demand of what the plaintiff has already done; and that the bill was entertained in that case, to enable the defendant, to prepare himself for trial.

But Lord Hardwicke could never mean to sanction so absurd a doctrine, as that the defendant, in every case, (for he lays it down as broad as possible,) might, previous to the trial of an ejectment, call upon the plaintiff in equity, to set out his title. If so, a bill of discovery, would be the necessary and constant companion of an ejectment; and why should the defendant have this advantage more than the plaintiff? But he clearly explains his meaning, by stating the purpose for which the discovery is compelled; i. e. that it may be seen whether the title is out of the plaintiff; not by any proof, which the defendant might be able to produce, but by the title set out by the plaintiff at law. None of the cases cited by the plaintiff, are so strong as that from Vesey; and I therefore feel myself compelled, by its authority, to yield my former opinion.

The plaintiff then produced a copy of Joseph Griswold's will, but insisted, that before the defendant could read, or have the advantage of it, he ought to make an affidavit, that he had not the original or a copy.

BY THE COURT. This is not necessary.

The defendant then objected, that the plaintiff must produce the original will. To this it was answered, that the notice is, to produce the will or a copy, and being in the alternative, he is at liberty to produce either; and as the copy now produced, was determined at the last trial not to be evidence, the original not having been proved in conformity with the laws of this state, it was objected, that, though produced, it could not now be read. In reply to this, it was insisted, and Peake's Evidence was cited, that the will coming from the hands of the plaintiff himself, it must be considered as the will of Joseph Griswold, without further evidence of its execution.

WASHINGTON, Circuit Justice. The difference is between a paper, the proof of which may be supplied by the acknowledgment of the party, who produces it, so as to make it available; and one which is inoperative, unless certain forms or proofs are pursued, or given, to establish it, and make it effectual. Thus a deed or letter may be established, by the acknowledgment of the grantor, or the person producing the letter. But all that can be inferred from the production of this copy, is, that it is a copy of the will of Joseph Griswold. What follows? This will not establish it, so as to pass land in this state, for to give it this effect, the will must be proved by two witnesses. Even if the plaintiff were to produce the original will, still it would not avail the defendant, unless the execution of it were proved, in conformity with the laws of this state; and as the defendant does not pretend that he can do this, it is unimportant whether the original, or a copy, is produced.

PETERS, District Judge, was of opinion,

that the will could not be used, without proving it as the law of this state directs.

The cause was argued upon its merits, much as formerly. On the subject of what constitutes inhabitancy, the following additional cases were cited by plaintiff: Burrows, Sett. Cas. 569, 529, 535, 536, 243, 129, 586, 825; 2 Burrows, Sett. Cas. 290, 291, 420; [Barnet's Case] 1 Dall. [1 U. S.] 152; [Taylor v. Knox] Id. 158; [Penman v. Wayne] Id. 246, 348; 2 C. Rob. Adm. 322. On the other side, 4 Bac. Abr. 753; 2 Strange, 924; 2 Inst. 702, 703; Cart. 119; 3 Burn, J. P. 12. As to the period when the treaty took effect, the defendant's counsel cited in addition, Vatt. Law Nat. bk. 2, c. 12, §§ 156, 157; 1 Abbe Mably, 113–217.

The charge was much the same as was delivered at the last trial, except as to the construction of the act of March, 1779, and the validity of the act of the 31st of January, 1783.

Lewis, Tilghman & Dallas, for plaintiff.
Ingersoll, Rawle & M'Kean, for defendant.

Before WASHINGTON, Circuit Justice, and PETERS, District Judge.

WASHINGTON, Circuit Justice (charging jury). The question is, what is the operation of the act of March, 1779, on the rights of these parties? It is contended by the defendant, that the lessor of the plaintiff, claiming under Joseph Griswold the father, who was attainted, and his land seized, and sold, he is barred of all remedy against the purchaser, but must look to the state for indemnification. But this argument is built upon a begging of the question. The defendant asserts, that the father was the person attainted, which the lessor of the plaintiff denies. If, in fact, he was the person attainted, and the only question was, is the attainder erroneous; then upon general principles, independent of the 6th section of this law, he, or those claiming under him, could not controvert the title of the purchaser in a collateral action; but would be compelled, first, to reverse the attainder, and then to obtain a judgment of restitution. This would have been the case, but for this section; which, upon reversal, prevents the judgment of restitution, as against a bona fide purchaser, and substitutes the state as bound to make reparation. In cases of attainder, under the law of 1778, there were three modes of proceeding to obtain redress, where an injury had been done to the person attainted, or to third persons, pointed out by law. First. Third persons claiming by deeds under or paramount; the attainted person might, within a limited time, interpose his claims to the land, or to satisfaction thereout of debts charged on it, which were to be decided in a particular way. This remedy did not extend to the traitor himself. Secondly. The attainted person himself, his

heirs, executors, and administrators, or those who were prejudiced by the attainder, might, if it were erroneous, reverse it upon the principles of common law; and having succeeded, he would be entitled, not to a judgment of restitution against a bona fide purchaser, but to indemnity against the state. Or, thirdly, any person, other than the attainted traitor, or those claiming under him, might bring an ejectment to recover land, to which he has a title, which had been sold in consequence of an attainder. Now, in this case, the plaintiff does not complain, that there is any error in the attainder; but on the contrary, it is admitted, or at least nothing appears to the contrary, that Joseph Griswold, distiller, at the time of the proclamation, or theretofore, an inhabitant of the state of Pennsylvania, was correctly called upon and attainted; but he contends, that Joseph Griswold, whose land was sold, was not called upon, and therefore was not, and could not be attainted. If so, this Joseph Griswold could not have reversed the attainder, however erroneous it might be, because he was neither party, privy, nor was he prejudiced by it; and of course he could not make himself party to the record. If Thomas Griswold had been called upon and attainted, Joseph Griswold could not have brought a writ of error. The error complained of, is not in the attainder, but in the subsequent seizure and sale of Joseph Griswold's land, in consequence of the attainder. But, if on a judgment against A, the property of B is taken in execution, the execution is void as to B, and he may recover back his property, or sue the officer and party; but he could not sue out a writ of error to reverse the judgment to which he was neither party nor privy, nor which (judgment) had prejudiced him at all. The true distinction is this;—if a person be attainted under process, which is incomplete in describing him, as, if the proper additions be omitted; this is an error of which he may avail himself by writ of error; because, having been truly named, he is a party to the record, and may maintain the writ. But, if the description be repugnant to truth, as if he called by a wrong name, or trade, or if he be stated as being of a place, which is not true; then the description does not apply to him. He never was party to the record; if so, he never was attainted, and therefore he cannot reverse the attainder; but then he is not bound by it, and may consequently sue for his property, which has been seized or sold, in execution of the attainder, as if no such attainder had taken place. How was it in Buffington's Case? Did he attempt to reverse the attainder? By no means. He could not have done it, since he was not attainted. But when called upon to show why execution should not issue, he pleaded that he was not the person attainted; and this was the opinion of the court,

upon the ground, that he was described to be of East Bradford, instead of West Bradford township, and this, though there was no other person known, who answered the description. In Lord Pitsligo's Case, and in Gordon's, they did not attempt to reverse the attainder, but filed their claims upon the ground of a false description. If then Joseph Griswold has been falsely described, he is expressly within the 8th section of the law, and the plaintiff is not barred of his action.

The next question is, was the law of the 31st January, 1783, passed posterior to the treaty, or not? If it was, then Mr. Ingersoll has admitted it to be void, as being in contravention of the treaty. This question, I consider in two points of view. First, at what time does a treaty take effect, if no period is fixed in the body of it, or by the agreement of the ministers? Second, at what period did the treaty of peace between Great Britain and the United States take effect, from the terms of the provisional articles? Vatt. Law Nat. bk. 2, c. 12, §§ 156, 157, says: "That every promise made by the proxy, within the terms of his commission and his powers, is binding on his constituents. At present, to avoid all danger, princes reserve to themselves the power of ratifying what has been concluded by their ministers. The commission of the plenipotentiary is but a procuration cum libera. As princes cannot be compelled, but by force, to fulfil their engagements, it is customary to place no dependence on their treaties, till they have agreed to ratify them. Thus, as every agreement of the minister remains invalid, till sanctioned by ratification, there is less danger in giving unlimited powers. But, before a prince can honourably refuse to ratify a compact, made in virtue of such plenipotentiary commission, he should be able to allege strong and substantial reasons; and, in particular, to prove that his minister has deviated from his instructions." In this extract, I understand Vattel merely to state, that a government is bound to fulfil an agreement of its ministers, if made within the scope of their authority; but, if it refuses to ratify, it is not bound by the agreement; because, according to modern custom, the power of ratifying is reserved by the government, to avoid the inconvenience and danger, which might result from the minister exceeding his authority; and, if so, then the same author declares, that the sovereign is bound by the agreement, and, unless its operation is postponed by the terms of the agreement, to a particular day, it takes effect from the signature. The Abbe Mably does not contradict this, but merely contests the position of Grotius, that the treaty binds from the signature, whether it is ratified or not. Rutherforth is still more express: he says, vol. 2, p. 581: "That what a government does by their deputies, is

their own act; and, consequently, in respect of the nation, it produces the same effect as if they had done it themselves. In public compacts, which sovereigns make by their deputies, the law of nations is the same as in promises which individuals make by proxy; what they do under the authority of their public commission, binds their principals, even though they should exceed some private instructions from their principals."

Second. When does the treaty between Great Britain and the United States take effect, from the terms of it? Answer; from the time that terms of peace are agreed upon between Great Britain and France, and Great Britain shall be ready to conclude the same. It is argued, that all this means, from the time the agreement is not only made and signed, but is ratified also. If this was the intention, why was it not so expressed? The ministers knew the full import of the expressions they used, and would never have expressed themselves loosely, when plain, unambiguous expressions were at hand. In the treaty between Holland and Great Britain, the effect of the treaty is suspended till ratification, by express terms. Whether the treaty between England and France was so suspended, does not appear; and it is not to be inferred, from the circumstance of certain periods from the ratification being fixed upon, when hostilities are to cease in particular places. But, be this as it may, the provisional articles between Great Britain and the United States being, by the terms of it, to take effect, when terms of peace are agreed upon between Great Britain and France, and Great Britain is ready to conclude the same. Let us examine these expressions, and see what they mean. "Agreed upon:" that is, when the ministers have come to an understanding, as to the terms of the treaty, and have reduced them to writing. "Concluded:" that is, when the agreement, thus understood, has received its last form, by being signed and duly executed by the minister. It is this which concludes all agreements, whether made by nations or by individuals. That this is the meaning of the word "concluded," is plain from the above quotation from Vattel, and from other expressions used by him in book 3, c. 16, § 238, speaking of truces, where he uses the words as importing a signature, either by the sovereign, or by his general. But it goes on, and says: "And Great Britain shall be ready to conclude the same." Now, when the treaty was signed by her ministers, she had shown her readiness to conclude it. That ratification was not considered as a necessary condition, is plain from the readiness to conclude, being applied only to Great Britain; and this further proves, that Great Britain and the United States would have been at peace, and yet Great Britain and France be at war. For, if Great Britain had concluded the

treaty, and even ratified it; yet, though France had refused, still the treaty would have been in force between Great Britain and the United States. If ratification had been meant, it would have provided for the exchange of ratifications, as, in most other treaties is common. The fact is, and we all know it as a matter of political history, that the United States were anxious to hasten, and France as much so to protract, the conclusion of the negotiations; and the ministers of the United States, did not think it prudent or necessary, to delay the completion of the treaty, after the terms of peace were agreed upon between Great Britain and France, and were finally concluded by the signature of their ministers.

Mr. Jefferson's letter to Mr. Hammond has been read, but so much in detached parts, that it is impossible to say which side may place most reliance on this authority; and it is impossible to do justice to his argument, without going through the whole of it. As a proof of this, look at what is said in the text, page 39, in which he speaks of the treaty being signed by the ministers of Great Britain and France, of which notice had been given to congress; and then adds: "The event having now happened, on which the provisional articles were to come into operation," &c. "Now happened," must relate to the signature, or to the notice. It cannot relate to the latter; because, in the notes, he cites authorities to prove, that the nation is bound so soon as the treaty is concluded, the people, from the time it is made public. He then must refer to the signature; and, if so, it is a complete authority for the opinion we hold. Yet, immediately after, he speaks of this very law of the 31st of June, 1783, as being out of view upon the subject of infractions of the treaty. If the United States were bound by the signature, so were the state governments, who stood in a very different situation from individual citizens; the former of whom could not be punished for contravening the treaty, as individuals might. Upon the whole, we are constrained to say, that the treaty between Great Britain and the United States, was in force from the 20th January, 1783; and, consequently, upon the admission of counsel, of what could not be questioned, the act of 31st January, 1783, is out of the question.

The jury found for plaintiff. Exceptions were taken, but no writ of error was prosecuted.
[See Cases Nos. 6,980 and 6,981.]