SAMUEL DAVIS, PLAINTIFF IN ERROR, v. THE POLICE JURY OF THE PARISH OF CONCORDIA.

The treaty of St. Ildefonso, by which Spain ceded Louisiana to France, became operative to transfer the sovereignty upon the day of its date, viz. the 1st of October, 1800.

The executive and legislative branches of the government of the United States have always maintained this position, and this court concurs with them in its correctness.

The preceding case, p. 127, of The United States v. Reynes referred to.

By the laws of nations, all treaties, as well those for cessions of territory as for other purposes, are binding upon the contracting parties, unless when otherwise provided in them, from the day they are signed. The ratification of them relates back to the time of signing.

Where territory is ceded, the national character continues for commercial purposes, until actual delivery; but between the time of signing the treaty and the actual delivery of the territory, the sovereignty of the ceding power ceases, except for strictly municipal purposes, or such an exercise of it as is necessary to preserve and enforce the sanctions of its social condition.

The power to grant land or franchises is one of those attributes of sovereignty which ceases.

The Spanish Governor of Louisiana had, therefore, no right to grant a perpetual ferry franchise on the 19th of February, 1801; and, consequently, it is not property which was protected by the treaty between France and the United States.

THIS case was brought up from the Supreme Court of the State of Louisiana, by a writ of error issued under the twenty-fifth section of the Judiciary Act.

As the decision of the court turned upon the single point when the treaty of St. Ildefonso became operative, so far as to extinguish the right of the Spanish governor to grant a perpetual franchise, it is not necessary to give a detailed statement of the facts in this case, nor of the arguments of counsel upon the points which were not included in the decision of the court.

The following summary will sufficiently explain the case.

Davis, the plaintiff in error, filed his petition in the Ninth District Court of the State of Louisiana, in and for the Parish of Concordia, on the 7th of February, 1840, in which he sets forth, that the Marquis de Casa Calva, then Governor-General of the Province of Louisiana, on the 19th of February, 1801, granted to one Thomas Thompson, then of said parish, the privilege of a ferry at the post of Concordia, in said parish, opposite to the then town, now city, of Natchez, as a privilege to be attached to the plantation of said Thompson, which he then possessed, in order that from that place he might have and enjoy the exclusive privilege, &c., for reasonable and customary toll, as it might be established; and on condition that he, the said Thompson, would clear a certain public road or highway from the said post of Concordia to the Bayou Cocadelle (Coco-

drillo), in said parish. That Thompson fully performed the said condition, as appears by the certificate of Joseph Vidal, the commandant at said post of Concordia. That Thompson entered upon the privilege aforesaid, and performed the duties, and enjoyed the profits of said ferry, until the 16th of October, 1803, when he conveyed to Joseph Vidal all his right, title, and interest in and to said ferry and said tract of land. That the tract of land to which the privilege was attached was sold by Thompson to Vidal for the sum of four thousand dollars ; when the land without the ferry would not at the time have been worth more than eight hundred dollars. That said Vidal entered into possession of said ferry and plantation, and continued to keep and enjoy the same until the year 1817, when he sold and delivered the same to petitioner. That petitioner thus became the owner of the said tract of land, and the lawful proprietor of the exclusive privilege of keeping said ferry. That by the laws, usages, and customs of the Spanish government at the date of said grant, said grant operates to the exclusion of any other ferry, for the distance of one league above and one league below. That the title of petitioner, acquired from the Spanish government, has also a prescriptive right, founded on the possession and enjoyment thereof by himself and vendors since 1801.

The petitioner then set forth that the Police Jury of the Parish of Concordia, in April, 1839, established a ferry across the Mississippi, from the town of Vidalia, in the parish of Concordia, to the city of Natchez, which conflicted with his right.

The answer admitted the establishment of the ferry by the Police Jury, averred their right to do so, and contested the plaintiff's claim upon grounds which it is not necessary here to mention. Evidence was taken on both sides.

On the 14th of June, 1841, the Ninth District Court gave judgment for the defendants.

The case was carried to the Supreme Court of Louisiana, which, at October term, 1841, reversed the judgment of the District Court, upon matters of evidence. It is reported in 19 Louisiana Reports, 533.

Upon the second hearing before the Ninth District Court, judgment was rendered for the petitioner Davis, which, upon being again carried to the Supreme Court, was again reversed, and judgment rendered for the defendants. This last case is reported in 1 Louis. Ann. Rep. 288.

The petitioner, Davis, sued out a writ of error, and brought the case up to this court.

24 *

It was argued by *Mr. Coxe* and *Mr. Gilpin*, for the plaintiff in error, and *Mr. Jones*, for the defendant in error.

The counsel for the plaintiff in error contended, —

1. The plaintiff contends that the grant under which he claims originated in a contract by which the exclusive privilege of keeping a ferry in front of his plantation was given to Thomas Thompson, in consideration for making a road, which he did make.

2. That the words *con exclusion*, in the grant, mean that the sovereign or his agents shall not establish another ferry within a reasonable distance of his own.

3. That the ferry attempted to be established at Vidalia by the defendant is on the same line of travel, and in the immediate vicinity of his grant ; and, if it goes into operation, the obligation of the contract which he holds will be impaired, and his benefit greatly diminished, contrary to the true intent and meaning of the grant.

Recognizing the supervising authority of this court, and yielding to the supposed exposition of law by this tribunal, the Supreme Court of Louisiana decided that the words *con exclusion* were susceptible of an interpretation different from that given to them by complainant's counsel; and therefore it was incumbent on that court to give to that expression this narrow and restricted meaning. On the part of the plaintiff in error, it will be contended that this court erred.

This case, on the same pleadings, has been twice before the Supreme Court of Louisiana ; on the first occasion, reported in 19 Louisiana, 533, it came up on bill of exception taken on the trial on sundry rulings of the District Court as to the admission or rejection of testimony. The plaintiff's title was, however, then exhibited, as it now is, and sustained by the same documentary evidence which is now produced. The validity of this title was then denied by defendant, as it now is, and was then at issue. Yet, throughout the entire argument of counsel, and the opinion of the court, no doubt is breathed as to the extent of the privilege embraced in the grant. The cause was remanded, with instructions to the District Court as to the competency of testimony alone.

On the second trial, the District Court did conform to these directions, and a verdict was rendered for the plaintiff.

On a second appeal to the Supreme Court, every point which was decided in the District Court directly was affirmed ; but a new point was gratuitously taken by that court, on which its decision was adverse to plaintiff; and this point is that which

Davis v. The Police Jury of Concordia.

is alone presented on this writ of error.  1 Louisiana Ann. Rep. 288–292.

The Louisiana court appeared to think this case closed by the Charles River Bridge case, in 11 Peters, 423, and understood it as asserting, " that, if any other meaning can be given to a grant besides that which would surrender for ever a franchise, and a part of the sovereign power, that meaning must be preferred." We contend that the language and meaning of this court in the case cited have been misunderstood; and that no such doctrine ought to govern the present case.

We shall further contend, —

1. That the mere grant of a ferry privilege across the Mississippi, by competent authority, implies, *ex vi termini*, an exclusion of all other ferry rights; not only by private unlicensed individuals, but operates to exclude the sovereign from making a similar grant, or one which will conflict with it, and impair or destroy its value to another.

2. That the grant in this case, *con exclusion*, is such an express recognition of such exclusive right.

3. That this is a case of express contract, by which, for a valuable consideration, Thompson became the purchaser of an exclusive ferry privilege.

4. That the uninterrupted and uncontested right thus claimed, having been exercised and enjoyed by himself, and those under whom he claims title, for a period of thirty-eight years, furnished the most conclusive evidence of title against defendants.

The authorities relied upon to sustain these positions are those referred to in the cases already cited from the Louisiana Reports, and 11 Peters; with the opinion of this court, pronounced during the present term, in the Illinois Ferry case, — confirming the views here taken of the Charles River Bridge case. West River Bridge v. Dix, 6 How. 507 ; 25 Wend. 631 ; 12 Pet. 435 ; 1 How. 194 ; Partidas, 3, 18, 28, 37, 39, 5, 7, 20 ; Just. Dig., 8, 1, 20, 42, 9, 1 ; 1 Louis. Dig. 448, 476 ; 2 ib. 241 ; 2 White's New Rec. 190, 194, 516 ; 2 Martin's Treat. 329 ; 2 Stat. at Large, 245, 283, 324 ; 8 ih. 202 ; Louis. Code of Practice, 6, 296.

The sovereignty of Spain existed in full force at the time of the grant, and the property derived under it was protected by the treaty with France. Treaty of St. Ildefonso of 1st October, 1800, 2 White's New Rec. 516. Treaty of Madrid, 21st March, 1801, 2 Martin's Treat. Sup. 329. Royal Order of Delivery, 15th October, 1802, 2 White's New Rec. 190. Treaty of Paris, 30th April, 1803, 8 Stat. at Large, 202.

The second point made by *Mr. Jones*, for the defendant in error, was as follows : —

II. The grant in question, whatever the nature or extent of the interest intended to be conveyed by it, never, for an instant, had any validity, as against the United States or the State of Louisiana.

1st. Because it was not one of those complete and consummate grants, the validity, force, and effect of which were left by Congress to be determined by the general principles and rules of international law, but was executory in its nature, as being dependent, for its consummate force and effect, upon the performance of a condition by the grantee, and therefore within the purview of the laws of the United States making it necessary for all but consummate grants to pass through the regular process to confirmation by Congress, or to adjudication under the authority of Congress. (Laws of United States and judgments of this court in execution of them, hereinafter cited to other points, and *passim.*)

2d. Because the treaty of St. Ildefonso, as between the parties to it, operated from its date; and instantly transferred to France all the rights of municipal sovereignty and eminent domain then appertaining to the territorial sovereign; which Spain was bound to transmit undiminished and intact to France. During the time that Spain occupied the province, between the date of the treaty (1st October, 1800) and the delivery of the province over to France (30th November, 1803), the possession and the dominion, remaining with her, were held in trust for France. The authority resulting from such possession and dominion was limited to the ordinary acts of local administration, the preservation of order and the due execution of the laws, and extended not even to the granting away of royal demesnes or crown lands, far less to the irrevocable alienation of any portion of the eminent domain, or to the diminution of any of the rights of ultimate sovereignty then enjoyed by the territorial sovereign.

Even the United States are held to have taken the dominion of all the territories ceded to them, including whatever was ceded either by particular States or by France, under a strict trust for the new States intended to be carved out of such territories; and, as such trustees, bound to transmit all the rights of municipal sovereignty and eminent domain unimpaired to the new States; and were therefore incompetent to grant away from the new States any navigable waters, or the soils under them, or the shores, or, in short, any land below the ordinary high-water mark. Pollard v. Hogan, 3 How. 221 *et seq.*

Davis v. The Police Jury of Conco dia.

But all question of the disabling effect of the treaty of St. Ildefonso, from its date, upon Spanish authority to grant, or in any way to diminish, either the crown lands or any rights of territorial sovereignty, was completely closed in three months after the delivery of Louisiana to the United States, by an act of Congress positively repudiating all Spanish grants made after the 1st of October, 1800, with an exception of actual settlers before that date; and this court, conforming to the rule so repeatedly laid down in its own adjudications, which binds the judicial department to follow the lead of the political department of the government in the practical construction, assertion, and execution of all such national rights as are acquired, and of all such national obligations as are incurred, by treaty stipulation, has repeatedly adjudged Spanish grants to be void, because made after that date. Act of Congress, 26th March, 1804, erecting Louisiana into two territories, 2 Stat. at Large, 283; Foster and Elam v. Neilson, 2 Pet. 253; Garcia v. Lee, 12 Pet. 515; Pollard v. Kibbe, 14 Pet. 63.

If, therefore, the grant now in question be taken as going to vest a perpetual and irrevocable franchise in the grantee, it bound neither France nor the United States. The utmost extent of jurisdiction then remaining in any Spanish authority over ferries, was to license and regulate them; so as that the term of no license should go beyond the duration of the temporary possession and dominion held by Spain.

Mr. Justice WAYNE delivered the opinion of the court.

There is enough upon the record of this case to give this court jurisdiction, but not enough to give the appellant the relief for which he has brought it here.

His complaint is, that the application of the law of Louisiana for the establishment of ferries (2 Mart. Dig. 142, 3 Mart. Dig. 292) to a ferry franchise claimed by him, from Concordia to Natchez, is an invasion upon a right of property secured by the third article of the treaty between the United States and the Republic of France, ceding Louisiana to the former; and that it impairs the obligation of a contract, which was entered into between the Marquis de Casa Calvo and one Thomas Thompson, on the 19th of February, 1801, granting to Thompson a ferry at the post of Concordia to Natchez, as a privilege to be attached to his plantation, on condition that Thompson would clear a public road from Concordia to the Bayou Cocodrillo. The appellant claims the franchise and land to which it was attached, as a purchaser of both from Joseph Vidal, who bought from Thompson the grantee, on the 16th of October, 1803. It is

further said, that by the law, usages, and customs of Spain, in Louisiana, at the date of the grant, no other ferry could be established within a league above or below its locality. The interference with the franchise is said to be the establishment of another ferry by the Police Jury of Concordia, from the town of Vidalia, in that parish, to the city of Natchez. The validity of this proceeding is called in question, on the ground, as we have already said, of its being contrary to a treaty and the Constitution of the United States. Both having been decided by the highest court in Louisiana against the rights claimed, the cause is before us, under the provisions of the twenty-fifth section of the Judiciary Act of 1789.

In support of the appellant's case, his counsel urge, — 1st. That the grant of a ferry privilege across the Mississippi, by competent authority, implies, *ex vi termini*, an exclusion of all other ferry rights, not only by private, unlicensed individuals, but operates to exclude the sovereign from making a similar grant to another, which will conflict with it, or impair or destroy its value. 2d. That the grant in this case, *con exclusion*, is an express recognition of such exclusive right. 3d. That this is a case of express contract, by which, for a valuable consideration, Thompson became a purchaser of an exclusive ferry privilege. 4th. That the uninterrupted right thus claimed, having been exercised and enjoyed by the appellant, and those under whom he claims, for thirty-eight years, is conclusive evidence of title against the defendants.

We have placed the point in the case upon which the jurisdiction of this court attaches in near connection with the points just read, to show that three of them are not reëxaminable by this court, however they may have been adjudicated by the court below.

The first, second, and fourth points involve questions of what the sovereign may do, or not do, in granting a second ferry franchise which impairs the value of one previously granted; also, whether the words *con exclusion*, in the grant to Thompson, mean an exclusive and perpetual ferry franchise; and, lastly, whether its long use by Thompson and those claiming from him is, or is not, conclusive proof of the franchise, and that they may claim it prescriptively. All of these are questions depending upon the provincial laws of Louisiana, when belonging either to France or Spain; upon its territorial law afterwards, when it became a part of the United States; and upon such laws as may have been passed and continue to be in force in the State of Louisiana. Neither of them involves the validity of a treaty or statute of, nor an authority exercised

under, the United States; nor the validity of a statute or an authority exercised under a State, on the ground of being repugnant to the Constitution, treaties, or laws of the United States; nor do they, or either of them, draw in question the construction of any clause of the Constitution, or of a treaty or statute of, or commission held under, the United States.

What we have to decide in this case is, whether or not the franchise of a ferry given by the Marquis de Casa Calvo to Thompson is a property protected by the treaty by which Louisiana was ceded to the United States, or a contract bought by Thompson for a valuable consideration, which has been impaired by the action of the Police Jury of Concordia, under the laws of Louisiana.

Now, in our view of the case, it matters not what merits Thompson may have had in getting his privilege of a ferry; whether he made, or did not make, the road from the post of Concordia to Cocodrillo; or how long he and those claiming under him have had the use of the privilege; or what were the powers of the Governor of Louisiana to grant such a franchise, or to what extent other officers, acting temporarily as governors, could exercise the powers of sovereignty, delegated to one who was so by commission; or what were the usages in Louisiana, before it was ceded to the United States, in respect to ferry grants and the use of them, — if the sovereignty of Spain in Louisiana had been parted with when the Marquis de Casa Calvo gave this ferry right to Thompson. Had the Marquis, at the time it was done, supposing him to have been exercising the plenary power of a Governor of Louisiana, any official faculty to delegate to a subject of the king of Spain, as a franchise, a portion of the king's royal privilege or prerogative?

The contract must be tested, as all others are, whether they are national or private, by the competency of the parties to make it. If that does not exist, nothing can be claimed under it, except such equities as may have arisen to either from the conduct of one or the other of them in the transaction.

The transaction in this case is, that the Marquis de Casa Calvo, Governor-General of the Province of Louisiana, granted to one Thomas Thompson, on the 19th of February, 1801, a ferry at the post of Concordia, opposite to the town of Natchez, as a privilege to be attached to the plantation he possessed, " in order that from that place, with exclusive privilege, he may carry on the ferry across the river, demanding and receiving only the prices most equitable and customary which may be established with the accord of the commandant of the post of

Concordia," — "*que se fixavan con acuerdo del dicho commandante.*"

Four months before this privilege was given to Thompson, on the 1st of October, 1800, the treaty of St. Ildefonso was made, by which Spain retroceded to France the Province of Louisiana. The terms and conditions of that treaty we will speak of presently, as far as it may be necessary to do so, after we have shown the views taken by the different departments of the government of the United States of the obligations of it, when they began, and when the full sovereignty of Spain ceased over Louisiana.

Each of them has said officially, that the sovereignty of the king of Spain for granting lands in Louisiana ceased with the signatures of the treaty of St. Ildefonso, on the 1st of October, 1800. Within a year after the cession of Louisiana, Congress, having learned that concessions for lands had been made by the Governors of Louisiana, between the 1st of October, 1800, and the 30th of April, 1803, the date of our treaty with France, passed an act declaring all such concessions void, and of no effect in law or equity.

This act was passed coincidently with what had been the declaration of the executive department of the government. This court has said the same in several cases. In the case of the United States v. Joseph Reynes, decided at this term, it has been reaffirmed, with a more extended examination than had been made before of the treaty of St. Ildefonso, that also between the French Republic and the king of Spain, signed in Madrid on the 21st of March, 1801, with the order of Barcelona for the delivery of Louisiana to France in execution of both treaties, and of the treaty between France and the United States in connection with the actual delivery of the Province to the United States, on the 20th of December, 1803, by Laussat, the commissioner of the French government appointed for that purpose. The treaty of St. Ildefonso may be found in 2 White's New Rec. 516 ; that of Madrid of the 21st-of March, 1801, in 2 Martin's Treaties Sup. 329, and in 2 White, 501 ; the royal order given at Barcelona, and the proceeding thereon, in 2 White's Recop., from 190 to 196 inclusive ; the treaty between France and the United States, 2 White's Recop. 196 ; and the act of delivery by France to the United States, 2 White's Recop., from 225 to 228 inclusive.

In Reynes's case, the judgment of the District Court affirming his grant was reversed, on the ground that the treaty between France and the United States gave to the latter all the rights acquired by France by the treaty of St. Ildefonso, and

that the political sovereignty of the king of Spain in Louisiana to grant lands ceased with the date of it, on the 1st of October, 1800.

We will now show, that the decision in that case accords with the received usages of nations in respect to rights acquired under treaties; that it is sustained by all that we now know of what were the relations between France and Spain at the time of the event, and the motives of the two governments for entering into the treaty of St. Ildefonso.

All treaties, as well those for cessions of territory as for other purposes, are binding upon the contracting parties, unless when otherwise provided in them, from the day they are signed. The ratification of them relates back to the time of signing. Vattel, B. 4, c. 2, sec. 22; Mart. Summary, B. 8, c. 7, sec. 5.

It is true, that, in a treaty for the cession of territory, its national character continues, for all commercial purposes; but full sovereignty, for the exercise of it, does not pass to the nation to which it is transferred until actual delivery. But it is also true, that the exercise of sovereignty by the ceding country ceases, except for strictly municipal purposes, especially for granting lands. And for the same reason in both cases; — because, after the treaty is made, there is not in either the union of possession and the right to the territory which must concur to give *plenum dominium et utile.* To give that, there must be the *jus in rem* and the *jus in re,* or what is called in the common law of England the *juris et seisinæ conjunctio.* "This general law of property applies to the right of territory no less than to other rights, and all writers upon the law of nations concur, that the practice and conventional law of nations have been conformable to this principle." Puffendorf par Barbeyrac, lib. 4, c. 9, sec. 8, note 2.

In this case, after the treaty was made, and until Louisiana was delivered to France, its possession continued in Spain. The right to the territory, though in France, was imperfect until ratified, but absolute by ratification from the date of the treaty. Such was the manifest intention, from the promise and engagement of his Catholic Majesty, in the third article of the treaty; — conditional upon the execution of the stipulations of the treaty relative to the Duke of Parma; but becoming retroactively absolute from the time of the signature of the treaty, as soon as these conditions were performed, or when others for the same end were substituted by the contracting parties.

The disability of France, or her refusal to perform the conditions for which the retrocession was to be made, would have released the king of Spain from his promise and engagement to

make it. It may also be, that the conditions were to be performed by France in the time mentioned in the first article, and that Spain was to keep possession of the territory as a security for that performance. But in either case, our conclusions that the rights of France attached, and that the sovereignty of Spain ceased from the signature of the treaty, would not be weakened; as the Republic of France and his Catholic Majesty entered into another treaty on the 21st of March, 1801, to determine in a positive manner what states were to be given to the infant Duke of Parma, as an equivalent for the Duchy of Parma. In which it is also declared, that this second treaty had its origin in that in which the king cedes to France the possession of Louisiana. And further, that the contracting parties agree to carry into effect the articles of that treaty, and that, while the difficulties with regard to them are in process of arrangement, the present treaty shall not destroy the rights of either party under the first treaty. And if, as has been said, possession was meant to be held by Spain, as a security for the fulfilment of the treaty by France, until the time when the delivery was to be made, that purpose must be considered as exclusive of any larger intent. The order given by Spain for the delivery of the territory to France precludes all inquiry about the performance of the stipulations of the treaties by either of the contracting parties. Its terms, as is said in Reynes's case, acknowledge that the right of France to the territory ceded was complete, and that the sovereignty of Spain over it ceased with the signature of the treaty of St. Ildefonso.

This view of the subject is confirmed by the subsequent conduct of Spain. When her relations with France had become less amicable than they had been, and it was rumored that France was negotiating a sale of Louisiana to the United States, the Secretary of State of Spain, Don Pedro Cevallos, wrote to our Minister, Mr. Charles Pinckney, remonstrating against the proceedings of France in disposing of Louisiana. He declared, also, if the United States bought it, that it would be an absolute nullity, as France had formally and positively engaged not to sell it. No other complaint was then or afterwards made in respect to the right of France to Louisiana, or when those rights began. 2 White's Recop. 546. Of course, as there was nothing of the kind in the treaty, the remonstrance was disregarded, and the purchase was made.

There will be found also, in the order given for the delivery of Louisiana to France, a further confirmation that the king of Spain had not his former sovereignty over it after the treaty of St. Ildefonso was signed, and that his ministers did not think he had in the interval until the delivery was made.

The order does not vary, except as to the thing to be done, from the usual formula for such a purpose. It is in fact a copy of the order which was given by France when Louisiana was ceded to Spain in 1762. That had been preceded by others like it for more than a hundred years, when the monarchs of Europe ceded to each other by treaty distant territories, either in India or America. This which we are now considering must have the same meaning which international usages have uniformly given to the whole of them.

There is always, in such an order, a commendation of the inhabitants, their interests generally, and of their possessions or property, perfect and inchoate, to the kind consideration of their new monarch, in the sense in which, presumptively, they would have been treated by the ceding sovereign. The language of it is hope, — not right, or the assertion of power. If it was not so, the order for delivery might impose larger obligations upon the nation who receives the territory than the treaty does. The relations as to the value and suitableness of the ceded territory for the purposes of colonization might be changed. Instead of having lands for gratuitous distribution to new colonists, or upon such terms of purchase as the policy of a new sovereign might make desiralde, that policy might be controlled by grants after the treaty for a cession has been signed. Indeed, before the signature of a treaty, but after negotiations have begun for a cession of territory, grants of land cannot be made in it without being subject to confirmation by the sovereign to whom the transfer shall be made. The inceptive equity of grants made by the governors of remote territories, who do not know that a cession of it has been made, or that negotiations have been begun for such an end, may be recommended to the kind consideration of the sovereign who receives the transfer; but no more can be claimed. When, then, the king of Spain gave his order at Barcelona for the delivery of Louisiana to France, and said, in royal terms, "meanwhile we hope" that all grants of property, of whatsoever denomination, made by my governors may be confirmed, although not confirmed by myself, he admits that he had not the sovereignty to confirm them; that he had no power to do then what he might have done before the treaty, and what he ought to have done if he had power afterwards to confirm them, — that which, in fairness to his former subjects and to his own honor, it may be presumed he would have done, but from being conscious that the power to confirm such grants had been transferred to France. Such orders for the delivery of ceded territories, though usual, are not always given, whether there is or is not a provision in the

treaty for it to be done. Without them, however, treaties could not be consummated in already settled territories, with a due regard to the respective rights of the contracting parties, or with the peaceable transference meant by them. They prevent violence, are the best proof of a change of national character, preserve the commercial rights of the inhabitants, give to them in the eyes of all the world the new rights and relations they may have acquired, and establish, in the most notorious way it can be done, that the ceded territory has become a part of another dominion, partaking with it all those relations which nations can have with each other in commerce, in peace, and in war,

Sir William Scott, in his opinion in the case of the Fama, 5 Robinson's Admiralty Reports, — given as early as February, 1804, upon the treaty of St. Ildefonso, retroceding Louisiana to France, (though the reporter cites it as of the date of the previous treaty of St. Ildefonso of 1796,) — coincides with our views respecting sovereignty over a ceded territory, and the commercial character, in which a people of a distant settlement are placed, by a treaty of the state to which they belong, and by which they are stipulated to be transferred to another power, before the delivery of the territory has been made.

The Fama sailed from New Orleans in April, 1803, for Havre de Grace, with Spanish property on board. She was taken on the way by a British cruiser, and her cargo libelled, it being alleged to be enemy's or French property only upon the ground that Louisiana had been ceded by Spain to France before the Fama sailed. The points stated in the words of Sir William Scott are, whether the treaty did not in itself confer full sovereignty and right of dominion to France, and whether the inhabitants were not so ceded by that treaty as to become immediately French subjects. The cause was fully argued on both sides by as able counsel as were in that day or since in the admiralty courts of England. The cargo was restored to the Spanish claimant, on the ground that the national character of a place agreed to be surrendered by treaty, but not actually delivered, continues as it was under the character of the ceding country.

He cites, in support of his conclusion, the treaty signed at Breda, on the 21st of July, 1667, between Louis the Fourteenth and Charles the Second, in which Nova Scotia was ceded to France; and the treaty of 1762, by which Louisiana was ceded by France to Spain. He might have found in the proceedings under the first, before the order for delivery was given, a confirmation of his conclusion, in the orders and

passes which were given to merchant ships before the treaty was ratified. Such passes were given to renew at once the navigation and commerce provided for in the fourth article of that treaty, and that French vessels might trade with Nova Scotia as a dominion of France before it was surrendered. His whole argument, too, for his conclusion shows that, when he says, " until a delivery has been made, the former sovereignty must remain," he did not mean sovereignty in the sense of the supreme power to govern and to dispose of the lands in a ceded territory, or for the exercise 'of any sovereign power in it other than that sovereignty which was necessary to preserve and enforce the sanctions of its social condition, and which would protect its inhabitants in all of their existing national relations, conventional or otherwise, whatever they might be, until they were actually surrendered. When delivery has been made, these relations cease for the future from the time it has been done, and those of the nation receiving the territory begin. That such was the extent and limit of Sir William Scott's use of the words "sovereignty must remain," is clear from the concluding words upon that point in the case. They are, — " I am of opinion, therefore, that on all the several grounds of reason or practice and judicial recognition, until possession was actually taken, the inhabitans of New Orleans continued under the former sovereignty of Spain." And when previously speaking of what passes full sovereignty in territory acquired by treaty, his test of union of possession and right to constitute full sovereignty excludes the idea of its entire continuance in a government which, having had both, had parted with its *right* to another, with a concomitant obligation to deliver the possession. In fact, the full sovereignty in such a case is not in one or the other of the contracting parties, but in both, for either to do whatever is essential to the preservation of the ability of each to consummate their contract, according to its terms.

. Of course, what we have just said respecting sovereignty in cessions of territory is meant to be understood of treaties signed by plenipotentiaries having full powers to do so, and which have been afterwards ratified ; and not of those conventions entered into and signed conditionally *sub spe rati,* by a minister not furnished with orders to execute it absolutely. Such was the treaty of Fontainebleau executed on the 3d of November, 1762, for the cession of Louisiana to Spain, which is cited in the opinion of Sir William Scott in the case of the Fama. In such a case nothing passes until acceptance of it by the king to whom the cession has been offered. And not

then, when it is as was the case in that instance; the cession of Louisiana having been promised by preliminary articles only, which were to be followed by a convention stipulating the measures, and the time to be fixed by common accord for the execution of the first.

We have thus shown, that the conclusion to which this court came in Reynes's case respecting grants of land in Louisiana, after the treaty of St. Ildefonso had been signed, is in harmony with the usages and law of nations. They would have required it, if the documents attending the transaction had not led to the same result. It has been shown before, that the legislation of Congress would not permit a different conclusion. The executive department of the government has uniformly acted under the same impression.

Finally, all of our proceedings respecting Louisiana have been done upon the principle, that the law of nations does not recognize in a nation ceding a territory the continuance of supreme power over it after the treaty has been signed, or any other exercise of sovere'gnty than that which is necessary for social order and for commercial purposes, and to keep the cession in an unaltered value, until a delivery of it has been made. Such being the extent of sovereignty under such circumstances, is not the grant of a perpetual ferry franchise attached to land as much prohibited as a grant of land?

We cannot distinguish between them, as to the source from which they can only be made. They are only distinguishable from each other in this, that one of them is exclusively for the grantee, and the other for the use of the public, with a compensatory right of toll attached. If a ferry franchise could be given in such a case, every other franchise might be. When the extent of Spanish royal prerogative in respect to franchises is considered, and especially such as the king of Spain could give in his foreign dominions under the Roman civil law, without any modification of it in the Partidas, it will not be forgotten, that natural persons and bodies corporate might have been invested with monopolizing privileges and exemptions, both on the land and the water, — that charters could have been given to places, with licenses and exemptions which might have interfered seriously with the policy and institutions of a state coming into the possession of ceded territory. We will not mention them in detail. Enough has been said to show, that, if such a sovereignty could be exercised after a treaty has been signed, it would be a power to change materially the relations which the people of a ceded territory had to each other; and to establish between them and a new sov-

ereign a different condition than had been contemplated when they were transferred.

. Such being the law of this case, we must say that the appellant, under the privilege of a ferry right given by the Marquis de Casa Calvo, had no property in it secured by the third article of the treaty by which Louisiana was ceded to the United States, and that no contract arose from it, the obligation of which has been impaired either by the legislation of Louisiana, or the action of the Police Jury of Concordia, under it.

We will remark further, that nothing can be inferred from what we have said in favor of the validity of any franchise relating to the navigation of the Mississippi, if any such was granted whilst Louisiana was a province either of France or Spain.

. We will not enter minutely into the history of the retrocession of Louisiana to France, or into that attending our acquisition of it. There is much in both to confirm the views we have expressed concerning national rights arising under treaties signed, and afterwards ratified. We have now, too, other · sources of information, contemporary with the transaction, which disclose more fully than was known until within a few years the policy of the First Consul in acquiring Louisiana. Stimulated by the European desire for colonies, and to counteract the impressions which might be made upon his popularity, and the glory he had given to France, if Egypt should be lost and St. Domingo should become valueless from the revolt of its slaves, he determined to avail himself of his power to gratify the wishes of the king and queen of Spain, by making the infant Duke of Parma a king in and over a part of Italy, with all royal rights and honors, and to get Louisiana in return. He meant to make it a permanent colony of France. He negotiated, as the treaties show, for an absolute retrocession of its people and territory, without other limitation than that which the law of nations secured to the former. It was to belong to France as it had been, when the generous weakness of Louis the Fifteenth, without either cause or consideration, ceded it to . Spain. On the other hand, that portion of Italy which was to be given for it was to be an unconditional transfer of people and territory, which, in the event of the failure of the issue of its new king, were to become absolutely a part of the Spanish monarchy. Neither contemplated any thing else, or that Spain should exercise a complete dominion in Louisiana, after having signed a treaty to cede it. There is not in the diplomacy of nations a more absolute surrender of dominion, than was made

by the king of Spain in the treaty of St. Ildefonso of October, 1800.

From that time until the treaty of Amiens was made, and afterwards, when it was foreseen it would be but a short truce, and would be followed by wars of longer duration, and greater changes in the condition of European nations than had been made in the wars of the ten preceding years, the First Consul, amidst all of his grand contemplations, did not lose sight for a moment of the colonization of Louisiana. Troops were embarked to take possession of it. Plans were made to colonize it exclusively with Frenchmen. He saw what might become our pressure upon it from the West, and to guard against the chances of war, which were then in this hemisphere in favor of England, it was to have been in its beginning a military colony under a leader of marked character and renown. France looked for commercial advantages from it, and a commanding war position over the Gulf of Mexico. It was hoped, too, that it would give to France, in the foreseen wars of Europe, favorable influences over the United States. That such a power as France, between the United States and Mexico, would check us in our career in that direction, and would give to France the control of Mexico, and the continuance of her control over Spain itself. It was not in the order of Providence, that such intentions should be accomplished. The First Consul foresaw a war, in which all the resources of France would be wanted, and all that could be gathered from every source. The war came sooner than he anticipated, or meant that it should. It deprived him of all certain ability to take possession, or to retain Louisiana if he had done so. The navy of England was in his way. With his usual decision, and in opposition to his counsellors, he determined to sell Louisiana to the United States, when we were then only negotiating for such a part of it as would secure to us the transit of our Western produce to the ocean. Our ministers, with promptitude never to be forgotten, without orders or powers from home to do so, secured the prize by the treaty of the 30th of April, 1803.

We shall direct this cause to be remanded for such further proceedings in the court from which it has been brought as that court may deem necessary.

### *Order.*

This cause came on to be heard on the transcript of the record from the Supreme Court of the State of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the

said Supreme Court in this cause be, and the same is hereby, affirmed, with costs, and that this cause be, and the same is hereby, remanded for such further proceedings as the said Supreme Court may deem necessary.