AMERICAN SUGAR REFINING CO. v. BIDWELL, Collector.

(Circuit Court, S. D. New York. August 7, 1903.)

No. 19,009.

1. CUSTOMS DUTIES—DATE OF IMPORTATION—ARTICLES ARRIVING FROM PORTO RICO AFTER CESSION TO UNITED STATES.

An article is not imported from a foreign country, within the meaning of the tariff laws, until it actually arrives at a port of entry of the United States; and sugar shipped from Porto Rican ports on April 8, 1899, when Porto Rico was a foreign country, but which did not arrive at the port of New York until April 17th, after Porto Rico had passed by treaty to the United States, was not subject to duty.

Action to Recover Customs Duties Paid. On demurrer to complaint.

The action was commenced in the Supreme Court of the State of New York, and removed to this court. It was brought to recover of the defendant the sum of $21,716.32, with interest from April 18, 1899, alleged to have been wrongfully and unlawfully collected from the plaintiff as duties upon a cargo of sugar brought from the island of Porto Rico to the port of New York in 1899.

Parsons, Closson & McIlvaine, for plaintiff.

Henry L. Burnett, U. S. Atty., and Henry C. Platt, Asst. U. S. Atty., for defendant.

RAY, District Judge. The complaint alleges that on the 17th day of April, 1899, the plaintiff caused to be brought into the port of New York by the steam vessel San Marcos from the ports of Aguadilla, Ponce, Fa Jardo, and San Juan, all situated in the island of Porto Rico, 1,073 packages of sugars, being those described in consumption entry No. 61,649, all of which were the product of the said island of Porto Rico, and was shipped from that island to the said port of New York on the said vessel on the 8th day of April, 1899. The complaint then alleges that upon the arrival at the port of New York of said sugars the defendant, who was then collector of said port, by duress of goods, demanded and collected from the plaintiff, as alleged duties upon the said sugars the sum of $21,716.32, which was paid on the 18th day of April, 1899, under due protest, and in order to obtain said sugars, and alleges that the said sum of money was wrongfully exacted, etc., and that no part of same has been repaid. The defendant demurs to this complaint upon the ground that the same does not state facts sufficient to constitute a cause of action, and that at the date when the merchandise therein mentioned was shipped from Porto Rico, to wit, April 8, 1899, Porto Rico was

¶ 1. See Customs Duties, vol. 15, Cent. Dig. § 7.

a foreign country, within the meaning of the tariff laws of the United States.

It is conceded by both the plaintiff and the defendant that at the time these sugars were shipped from Porto Rico on the steamer San Marcos, on April 8, 1899, Porto Rico was a foreign country. It is also conceded by both parties that Porto Rico ceased to be a foreign country on the 11th day of April, 1899. Dooley v. U. S., 182 U. S. 222–230, 21 Sup. Ct. 762, 45 L. Ed. 1074. See, also, Haver v. Yaker, 9 Wall. 32, 19 L. Ed. 571; Ex parte Ortiz (C. C.) 100 Fed. 962; Davis v. Parish of Concordia, 9 How. 280, 13 L. Ed. 138; Lessee of Hylton v. Brown, 1 Wash. C. C. 343, Fed. Cas. No. 6,982. The defendant contends that when these goods were shipped from Porto Rico, on the 8th day of April, 1899, they started as dutiable goods, and that the exportation from Porto Rico ended when the steamer left the shores of Porto Rico on that day, and that the importation into the United States then began, and was completed on their arrival at the port of New York on the 17th day of April, 1899, and that this importation was one continuous act or transaction, and that the importation is to be deemed to have taken place when it commenced, and not when it ended by the arrival of the goods at the port of entry. The defendant relies upon the expression of Mr. Justice Brown in giving the opinion of the court in De Lima v. Bidwell, 182 U. S. 1, 21 Sup. Ct. 743, 45 L. Ed. 1041, in which case, at page 180, 182 U. S., page 746, 21 Sup. Ct., 45 L. Ed. 1041, the learned justice said:

"Whether these cargoes of sugar were subject to duty depends solely upon the question whether Porto Rico was a 'foreign country' at the time the sugars were shipped, since the tariff act of July 24, 1897, c. 11, 30 Stat. 151 [U. S. Comp. St. 1901, p. 1626], commonly known as the 'Dingley Act,' declares that 'there shall be levied, collected and paid upon all articles imported from foreign countries' certain duties therein specified."

The tariff act of July 24, 1897, c. 11, 30 Stat. 151 [U. S. Comp. St. 1901, p. 1626], provides:

"There shall be levied, collected and paid upon all articles imported from foreign countries, and mentioned in the schedules herein contained, the rates of duty which are by the schedules and paragraphs, respectively prescribed."

In Act July 24, 1897, c. 11, § 1, Schedule E, par. 209, 30 Stat. 168 [U. S. Comp. St. 1901, p. 1647], certain rates of duty are prescribed on sugars.

At the time these sugars arrived in the United States and at the port of New York, Porto Rico had ceased to be a foreign country, and had become property of the United States; and no law had then been enacted by Congress imposing a duty on merchandise brought into the United States proper from territory belonging to the United States, and acquired, as was Porto Rico, under treaty with a foreign nation. In other words, there was no law imposing a duty on merchandise brought from Porto Rico to the ports of entry in the United States on the 17th day of April, 1899, and at the time these duties were levied, assessed, and collected. De Lima v. Bidwell, 182 U. S. 1, 21 Sup. Ct. 743, 45 L. Ed. 1041. The tariff act of July 24, 1897, was not applicable to merchandise brought from Porto Rico into the

United States on the 17th day of April, 1899; that is, imported from Porto Rico to the United States on that date. This has been settled by the Supreme Court of the United States. The government is therefore compelled to take the position that these sugars were imported into the United States on the 8th day of April, 1899, when the exportation from the port in Porto Rico ended, as is said, and the importation into the United States commenced. It is not necessary to determine whether or not the importation of these goods into the United States commenced on the date they left Porto Rico. This court is of the opinion that the transportation of these goods on the high seas was an act preliminary to importation into the United States, and not any part of the importation. Had the vessel, with its cargo, been lost at sea, it is clear that the sugars would not have been imported into the United States. Nor would they have been imported into the United States, had they been thrown overboard during stress of weather. Goods shipped in good order in a foreign country, and which become utterly worthless during the voyage, are not imported into the United States, even though the decayed remnants are not thrown overboard, but are brought into the port of entry with the remainder of the cargo. Lawder v. Stone, 187 U. S. 281, 23 Sup. Ct. 79, 47 L. Ed. 178. It is there held that merchandise which has become utterly worthless by reason of casualty, decay, or other natural causes, and which the importer might rightfully abandon and refuse to receive or enter for consumption, is not within the category of goods, wares, and merchandise imported into the United States, within the meaning of the tariff laws. In that case the court cites and approves Marriott v. Brune, 9 How. 619, 13 L. Ed. 282, and says:

"In Marriott v. Brune (1850) 9 How. 619, 13 L. Ed. 282, it was held that under the eleventh section of the tariff act of July 30, 1846 [c. 74, 9 Stat. 46], where a portion of a cargo of sugar and molasses was lost by leakage on the voyage to this country, duty should be exacted only upon the quantity of sugar and molasses which arrived here, and not upon the quantity which appeared to have been shipped. In the course of the opinion the court said (page 632, 9 How., 13 L. Ed. 282): 'The general principle applicable to such a case would seem to be that revenue should be collected only from the quantity or weight which arrives here; that is, what is imported, for nothing is imported till it comes within the limits of a port.' See cases cited in Harrison v. Vose, 9 How. 372 [13 L. Ed. 179]. And by express provision in all our revenue laws, duties are imposed only on imports from foreign countries, or the importation from them, or what is imported. [Act Feb. 26, 1845] 5 Stat. 548, 558. The very act of [July 30] 1846, under consideration, imposes the duty on what is 'imported from foreign countries.' Page 68. The Constitution uses like language on this subject. Article 1, §§ 8, 9. Indeed, the general definition of customs confirms this view, for, says McCulloch (volume 1, p. 548), 'Customs are duties charged upon commodities on their being imported into or exported from a country.' As to imports, they therefore can cover nothing which is not actually brought into our limits. That is the whole amount which is entered at the custom house; that is all which goes into the consumption of the country; that, and that alone, is what comes in competition with our domestic manufactures; and we are unable to see any principle of public policy which requires the words of the act of Congress to be extended so as to embrace more."

Until the contrary is expressly held, this court will adhere to the doctrine laid down in U. S. v. Vowell, 5 Cranch, 368, 3 L. Ed. 128,

and Arnold v. U. S., 9 Cranch, 104, 3 L. Ed. 671, in which cases it was expressly held that no article is imported from a foreign country until it has actually arrived within the limits of a port of entry.

In United States v. Vowell and another, 5 Cranch, 368, 3 L. Ed. 128, it was held that duties upon goods imported do not accrue until their arrival at the port of entry, and that therefore the duty upon salt, which ceased with the 31st of December, 1807, was not chargeable upon a cargo which arrived within the collection district before that day, but did not arrive at the port of entry until the 1st of January, 1808. Marshall, C. J., delivered the opinion of the court, and said:

"The duties did not accrue, in the fiscal sense of the term, until the vessel arrived at the port of entry. * * * It is understood that in case of an increase of duty the United States have always demanded and received the additional duty if the goods have not arrived at the port of entry before the time fixed for the commencement of such additional duty, although the vessel may have arrived within the collection district before that time. The same rule of construction is to be observed when there is a diminution of duty."

Following the decision in this case, the logical conclusion is that where duties cease altogether, for any reason, before the arrival of the goods at the port of entry, no duty can be collected.

In Arnold et al. v. U. S., 9 Cranch, 104, 3 L. Ed. 671, it was held that "to constitute an importation, so as to attach the right to duties, an arrival within the limits of some port of entry is necessary." The question in that case arose under the act of July 1, 1812, c. 112, 2 Stat. 768. That act provided "that an additional duty of 100 per cent. upon the permanent duties now imposed by law," etc., "shall be levied and collected upon all goods, wares and merchandise which shall, from and after the passing of this act, be imported into the United States from any foreign port or place." Story, J., in delivering the opinion of the court, said:

"It is further contended that the importation was complete by the arrival of the vessel within the jurisdictional limits of the United States on the 30th day of June. We have no difficulty in overruling this argument. To constitute an importation, so as to attach the right to duties, it is necessary not only that there should be an arrival within the limits of the United States, and of a collection district, but also within the limits of some port of entry. This was expressly decided in the case of the United States v. Vowell, 5 Cranch, 368 [3 L. Ed. 128]."

These cases have been frequently cited and approved since that time, and never overruled, unless it can be said that the expression of Mr. Justice Brown in De Lima v. Bidwell, 182 U. S. 180, 21 Sup. Ct. 746, 45 L. Ed. 1041, above quoted, has that effect. It is impossible to hold that such was the intention of the court, for we find the Supreme Court of the United States quoting, approving, and restating the doctrine of these cases, that nothing is imported into the United States, within the meaning of the tariff laws, until it actually arrives at the port of entry, in Lawder v. Stone, 187 U. S. 281, 23 Sup. Ct. 79, 47 L. Ed. 178.

There is no reason why goods, wares, and merchandise brought from Porto Rico into the port of New York, and arriving at that

port after Porto Rico had ceased to be a foreign country, and before Congress had enacted and passed a law imposing a duty on merchandise brought from Porto Rico into the United States, should be held to have been imported from a foreign country at the time they were shipped or left the foreign port, when they would not have been held to be so imported, had Porto Rico remained a foreign country, and had the tariff laws in force when the sugars were shipped been changed by either increasing or reducing the duties before the arrival of the vessel at the port of New York. When these sugars left Porto Rico, Porto Rico was a foreign country, within the meaning of the tariff laws of the United States; but, within the decisions referred to, the fact that the vessel left Porto Rico for the purpose of bringing the sugars to the port of New York did not constitute importation into the United States, within the meaning of the tariff laws. When these sugars reached the port of New York, Porto Rico had ceased to be a foreign country, and it was at that time that these sugars were imported into the United States. At that time the Dingley tariff act of July 24, 1897, did not operate on and could not operate on these sugars, for, if they were imported at that date, they were not imported from a foreign country, as Porto Rico had ceased to be a foreign country. The Foraker act was not then a law, and hence there was no law for the imposition of a duty upon the sugars in question. The situation described was not in the mind of Congress when the tariff act of July 24, 1897, was enacted. When that act was made a law, Congress had in mind importations from foreign countries, and not importations into the United States from territories belonging to the United States, such as Porto Rico and the Philippine Islands. The act of July 24, 1897, was not intended to cover such a situation, and we are not justified in giving a meaning to the words "imported from foreign countries" at war with the natural import of the language, and at war with the established decisions of the Supreme Court of the United States defining the words imported from foreign countries or imported into the United States. It may be a matter of regret to the government, and of congratulation to certain importers benefited by the situation, that no legislation had been provided for such a contingency; but courts are not justified in construing statutes to meet contingencies not within the intent of the lawmaking body, and not within the language employed or the decisions of the court, in order to cover a condition unthought of, and in fact unprovided for.

In the opinion of this court, following its decision in American Sugar Refining Company v. George R. Bidwell (No. 19,068, just handed down) 124 Fed. 677, the imposition and collection of these duties were illegal, and the complaint states a good cause of action. The demurrer must be overruled, with costs, and it is so ordered