## KANSAS PACIFIC RAILWAY COMPANY *v.* DUNMEYER.

IN ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.

Argued November 6, 1884.—Decided March 2, 1885.

The line of definite location of a railroad, which determines the rights of railroad companies to land under land grant acts of Congress, is definitely fixed, within the meaning of those acts, by filing the map of its location with the Commissioner of the General Land Office at Washington.

Under the acts granting lands to aid in the construction of a line of railroad from the Missouri River to the Pacific Ocean, the claim of a homestead, or pre-emption entry, made at any time before the filing of that map in the General Land Office, had attached, within the meaning of those statutes, and no land to which such right had attached came within the grant.

The subsequent failure of the person making such claim to comply with the acts of Congress concerning residence, cultivation and building on the land, or his actual abandonment of the claim, does not cause it to revert to the railroad company and become a part of the grant.   The claim having at-

tached at the time of filing the definite line of the road, it did not pass by the grant, but was, by its express terms, excluded, and the company had no interest, reversionary or otherwise, in it.

The act of July 3, 1866, 14 Stat. 79, which authorized the Secretary of the Interior to withdraw certain lands from *sale*, on filing a map of the *general route* of the road with him, did not reserve such lands from entry under the *pre-emption* and *homestead* laws.

Suit for breach of covenant of warranty of title to a tract of land in Kansas. Plaintiff in error was defendant below. Its title was derived from grants of public land to aid in the construction of a railway to the Pacific, under the acts of July 1, 1862, 12 Stat. 489; July 2, 1864, 13 Stat. 356; and July 3, 1866, 14 Stat. 79. The tract was within the location of the railroad grants, but was excepted from those grants by reason of a homestead entry, and possession. Subsequent to this entry and possession, the party so in possession took title from the railroad company, and the homestead entry was cancelled. The alleged paramount adverse title was derived from a patent from the United States, issued on a homestead entry made subsequent to these proceedings. The Supreme Court of Kansas found that there was a breach of the warranty, and rendered judgment accordingly. This writ of error was brought to review that judgment.

*Mr. J. P. Usher* for plaintiff in error.—*Missouri, Kansas & Texas Railway Co.* v. *Kansas Pacific Railway Co.*, 97 U. S. 491, goes far towards settling the construction of the acts of 1862 and 1864. They are there declared to be a single act, so far as the grants of land are concerned. Treating the acts as one, attention will now be directed to § 3 of the act of 1862, and § 4 of the act of 1864. In these sections are embraced the grant of lands and limitations. In § 3 the grant is described to be : "Every alternate section of public land, designated by odd numbers, to the amount of five alternate sections per mile on each side of said railroad, on the line thereof, and within the limits of ten miles on each side of said road, not sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached at the time the line of said road is definitely filed." § 4 of the act of

1864, after stating the amendments, goes on: " And any land granted by this act, or the act to which this is an amendment, shall not defeat or impair any pre-emption, homestead, swamp land, or other lawful claim." It will be observed that by § 3 there was excepted from the grant, lands upon which a homestead claim had attached at the time the line of the road was definitely fixed. It is clear that Congress did not intend that the words " to which a homestead or pre-emption claim may not have attached," in § 2 of the act of 1862, should defeat the grant to the railroad company, unless the claim was perfected. The grant was of public lands. Lands entered under homestead and pre-emption laws remained public lands until the titles were perfected. *Frisbie* v. *Whitney*, 9 Wall. 187; *Yosemite Case*, 15 Wall. 77 ; *Shepley* v. *Cowan*, 91 U. S. 330; *Railroad Co.* v. *Baldwin*, 103 U. S. 426. To relieve the company from any possibility of loss by reason of a misconstruction of the meaning of the words, "*may not have attached*," in § 3 of the act of 1862, Congress, in § 4 of the act of 1864, was explicit in declaring the exceptions from the grant. The declaration was that the grant " shall not defeat or impair any pre-emption, homestead, swamp-land or other lawful claim." This exception was in favor of the homestead or pre-emption claimants, and was intended to define and make certain what was granted. Obviously it was the intention of Congress to grant all the odd sections of the public lands within the prescribed limits, though entries of parcels of them may have been made under the homestead or pre-emption laws, unless the parties making such entries should perfect their titles. If such parties voluntarily abandoned their possession and entries, and that fact came to the knowledge of the Department of the Interior, the duty was to correct the books and make the fact appear, and allow the lands to be selected by the railroad company, and upon completion of the railroad, to issue patents to the company for such lands. It should be noted that Dunmeyer does not claim title under the homestead entry of Miller. He repudiates all right of claim under his entry, maintains with the railroad company that it was invalid and therefore was cancelled, and that he was defeated in his

possession by a subsequent entry by G. B. Dunmeyer under the homestead laws. The decision of this court in *Bugbey's Case*, 96 U. S. 165, is much in point here. In that case a party was found in possession of the south half of section 16, town 10, range 8, when the survey of public lands in California was made, and was therefore within the exception of the grant to the State, and might have proceeded and perfected his title under the pre-emption laws. He omitted to make claim under the pre-emption laws and abandoned his possession. In respect to the transaction this court said, on page 167, "the settler, however, was under no obligation to assert his claim, and he having abandoned it, the title of the State became absolute as of May 19, 1866, when the surveys were completed." It is difficult to perceive why the law laid down by this court in that case is not conclusive in favor of the railroad company in this.

No appearance for defendant in error.

MR. JUSTICE MILLER delivered the opinion of the court.

This is a writ of error to the Supreme Court of Kansas.

The action was brought in that court on a covenant of warranty of title to two pieces of land, in a deed of conveyance made by the company to Dunmeyer. The land was sold by the company to George W. Miller, to whom a certificate of sale was given, which afterward came by assignments to Lewis Dunmeyer, to whom the company made a deed purporting to convey a good title. On this covenant for good title Dunmeyer brought the present action, alleging that the railroad company never had any title, and that the covenant was therefore broken. On this issue the case was tried. Several other defences were set up; among them, that the covenant was not broken, because Dunmeyer was in possession when he bought the certificate issued to Miller and when he took his deed, and has never been disturbed or ousted; that Miller was in possession when he bought of the company and transferred possession to Dunmeyer, and that this has been held ever since; and that Miller's purchase was a compromise of disputed rights, and he

and Dunmeyer are therefore estopped to maintain this action. But these and perhaps other points, decided against plaintiff in error, do not present questions of federal law which this court can review in a judgment of a State court.

Two such questions are presented by this record, which are said to be of great importance as covering controverted titles to many thousand acres of valuable land. The sum involved in this suit is but little over $300 and while the plaintiff in error has been represented here by able counsel and by oral arguments at two different hearings, we have no aid from the defendant, either by counsel or brief. This is very much to be regretted, but is without remedy, and only devolves on the court the duty of more than ordinary care in its own examination of the case.

The claim of title of the railroad company, which the Supreme Court of Kansas held to be no title, arises under two acts of Congress granting land to the Union Pacific Railroad Company and its branches, namely, the act of July 1, 1862, 12 Stat. 489, and the amendatory act of July 2, 1864, 13 Stat. 356, and another act of July 3, 1866, 14 Stat. 79.

The land, the title to which is in controversy in this suit, is part of an odd-numbered section, and lies within ten miles of the company's road, and the title of the company to it when it made the conveyance to Dunmeyer was perfect, under the grant found in the acts of Congress mentioned, unless it came within some of the exceptions contained in the language of the grant. The Supreme Court of Kansas based its decision on the ground that it did come within the language of such an exception. That language is as follows:

"§ 3. And be it further enacted, That there be, and hereby is, granted to the said company, for the purpose of aiding in the construction of said railroad and telegraph line, and to secure speedy transportation of the mails, troops, munitions of war, and public stores thereon, every alternate section of public land, designated by odd numbers, to the amount of five alternate sections per mile, on each side of said road, on the line thereof, and within the limits of ten miles on each side of said road, not sold, reserved, or otherwise disposed of by the United

States, and to which a pre-emption or homestead claim may not have attached, at the time the line of said road is definitely fixed." 12 Stat. 492. An exception of mineral lands follows in a proviso which does not affect the present question.

The record shows that on July 25, 1866, Miller made a homestead entry on this land which was in every respect valid, if the land was then public land subject to such entry. It also shows that the line of definite location of the company's road was first filed with the Commissioner of the General Land Office at Washington, September 21, 1866. This entry of Miller's, therefore, brought the land within the language of the exception in the grant as land to which a homestead claim had attached at the time the line of said road was definitely fixed. For we are of opinion, that under this grant, as under many other grants containing the same words, or words to the same purport, the act which fixes the time of definite location is the act of filing the map or plat of this line in the office of the Commissioner of the General Land Office.

The necessity of having certainty in the act fixing this time is obvious. Up to that time the right of the company to no definite section, or part of section, is fixed. Until then many rights to the land along which the road finally runs may attach, which will be paramount to that of the company building the road. After this no such rights can attach, because the right of the company becomes by that act vested. It is important, therefore, that this act fixing these rights shall be one which is open to inspection. At the same time it is an act to be done by the company. The company makes its own preliminary and final surveys by its own officers. It selects for itself the precise line on which the road is to be built, and it is by law bound to report its action by filing its map with the Commissioner, or rather, in his office. The line is then fixed. The company cannot alter it so as to affect the rights of any other party. Of course, as soon as possible, the Commissioner ought to send copies of this map to the registers and receivers through whose territory the line runs. But he may delay this, or neglect it for a long time, and parties may assert claims to some of these lands, originating after the company has done its duty

—all it can do—by placing in an appropriate place, and among the public records, where the statute says it must place it, this map of definite location, by which the time of the vestiture of their rights is to be determined. We concede, then, that the filing of the map in the office of the Commissioner is the act by which "the line of the road is definitely fixed" under the statute. *Van Wyck* v. *Knevals,* 106 U. S. 360.

It is strongly argued, by counsel for plaintiff in error, that the language of the excepting clause in the third section of the act of 1862 is modified or repealed by certain expressions found in § 4 of the amendatory act of 1864.

That section is intended to increase the grant of land made by the act of 1862 to double the quantity then granted. It does this by very peculiar language. It was evidently designed that the new grant should relate back for its date to that of the original grant, whereby it became retrospective as to all the lands added by the new act. It says that "five" in the old act shall read "ten," where the number of sections are mentioned. That "ten" shall read "twenty" where the limits within which the section may be found is described by miles. And it says that the term "mineral lands," in the exception in the grant, shall not be construed to mean coal or iron lands. Seeing, however, that this retrospective grant might affect rights already accrued or initiated, it is said in immediate connection, and in the same section, that "any lands granted by this act, or the act to which this is an amendment, shall not defeat or impair any pre-emption, homestead, swamp-land, or other lawful claim, nor include any government reservation or mineral lands, or the improvements of any *bona fide* settler, on any lands returned and denominated as mineral land." 13 Stat. 358.

It is difficult to see how this language, the main purpose of which was to prevent this retroactive grant from harming any kind of a claim to the lands granted which had taken effect before the statute was passed, can be construed as repealing the fundamental clause of the original act, in which the character of the grant and of its exceptions are fully defined.

This new provision may make other exceptions while enlarging the grant, and was undoubtedly intended to add further safeguards to the settler and further protection to the public. But how the clause can be supposed to narrow the original exception, or to be a substitute for that exception, or to repeal it, is not readily to be seen.

It had no such purpose. It had a very different purpose, and clearly leaves the original section, which it changes as to the limit of the grant, to stand as to the exception, save as further exceptions are added.

Another argument, which at first blush appears to rest on a stronger foundation, requires examination.

The record shows that while the company did not file its line of definite location until about two months *after* Miller made his homestead entry, it did designate the general route of said road, and file a map thereof in the General Land Office, July 11 of the same year, 1866, which was fifteen days *before* Miller's homestead entry. This latter map was filed in the office of the register and receiver on the 26th of July, one day after Miller made his entry.

It is argued that until this was done Miller's right of entry remained unaffected.

But we are of opinion that the duty of filing this map, as required by the act, like that of the line of definite location, is performed by filing it in the General Land Office, which is filing it with the Secretary of the Interior, and that whatever rights accrue to the company from the act of filing it accrue from filing it there.

What are those rights? This action does not, like the filing of the line of definite location, vest in the company a right to any specific piece of land. It establishes no claim to any particular section with an odd number. It authorizes the Secretary to withdraw certain land from sale, pre-emption, &c. What if he fails to do this? What if he makes an order, as in this case, withdrawing a limit of twenty-five miles from sale, yet permits a party to enter and obtain a patent on some of this land?

Without answering these general questions, we proceed to

show that, by the statutes under which the company claims the land, the act of filing this map, did not withdraw the land from homestead entry.

By § 7 of the act of 1862 it is "provided, that within two years after the passage of this act, said company shall designate the general route of said road, as near as may be, and shall file a map of the same in the Department of the Interior, whereupon the Secretary of the Interior shall cause the lands within fifteen miles of said designated route or routes to be withdrawn from *pre-emption, private entry, and sale;* and when any portion of said route shall be finally located, the Secretary of the Interior shall cause the said lands hereinbefore granted to be surveyed and set off, as fast as may be necessary for the purposes herein named."

At the time of the passage of the amendatory act of 1864, the general route of the road had not been designated, and, therefore, the fifth section of that act says "that the time for designating the general route of said railroad, and of filing the map of the same, and the time for the completing of that part of the railroads, required by the terms of said act [of 1862], of each company, be, and the same is hereby, extended one year from the time in said act designated."

It appears that in the year 1866, though the time for the designation of the general route had expired a year before, it had not yet been done or completed. To relieve the company from this failure to comply with the law, Congress enacted, July 3, 1866, "that the Union Pacific Railway Company, Eastern division [which is the branch now called the Kansas Pacific Railway Company], is hereby authorized to designate the general route of their said road and file a map thereof, as now required by law, at any time before the first day of December, eighteen hundred and sixty-six; and upon the filing of the said map, showing the general route of said road, the lands along the entire line thereof, so far as the same may be designated, shall be reserved from *sale* by order of the Secretary of the Interior."

It is under this latter statute that the railroad company, now plaintiff in error, filed its map of the general designation of the

route in the Department of the Interior, July 11, 1866, fifteen days before Miller's entry.

It will be observed that by the act of 1862, upon the filing of the company's map of designation of its general route, the Secretary was required to withdraw the lands within fifteen miles of said designated route from "*pre-emption, private entry, and sale.*" In the terminology of the laws concerning the disposition of the public lands of the United States, each of these words has a distinct and well-known meaning in regard to the mode of acquiring rights in these lands. This is plainly to be seen in the statutes we are construing. In the third section or granting clause there are excepted from the grant all lands which at the time the definite location of the road is fixed had been *sold, reserved,* or otherwise disposed of, and to which a *pre-emption* or *homestead* claim had attached. Here sale, pre-emption, and homestead claims are mentioned as three different modes of acquiring an interest in the public lands, which is to be respected when the road becomes located, and the words are clearly used because they were thought to be necessary. But a sale for money in hand, by an entry made by the party buying, is throughout the whole body of laws for disposing of the public lands understood to mean a different thing from the establishment of a pre-emption or homestead right where the party sets up a claim to a definite piece of land, and is bound to build on it, make fences, cultivate and reside on it for a period of time prescribed by law.

In the act of 1866, after the company had neglected for four years to make this designation of their general route, they were allowed six months longer, and no more, to file their map.

The statute did not give the Secretary the same directions when this should be done which the original act of 1862 gave him, but this act declared that the lands along the entire line, so far as the same may be designated, shall be reserved from *sale* by order of the Secretary of the Interior. The lands were, therefore, to be reserved from sale only, and not from pre-emption or homestead claims. The dropping of these words in the later enactment, when they had been carefully inserted both in the excepting clause of the original grant and in the

direction for withdrawal in the same act, on filing the designa-
tion of the general route, is sufficient of itself to show a
purpose in leaving them out of the reserving clause of the act
of 1866.

There is, however, a very obvious reason for it. The com-
pany had been negligent about filing this map. It was asking
further time to do so as a favor. Congress said : We will grant
you six months more, and when your map is filed the mere
purchaser for money shall not be permitted to buy within the
limit of your general route. He may be buying for specula-
tion on the rise in value produced by the construction of your
road. But we will no longer prevent the actual-settler who
resides upon and improves this land from locating on it and
establishing a right either under the pre-emption or the home-
stead law. You have it in your power to put an end to this as
soon as you will, by filing the map of your definite location of
the road in the land office. Until you do this, the actual settler
shall not be excluded from these lands.

We are, therefore, of opinion, in view of all the legislation
on this subject, that the homestead claim of Miller had attached
to the land in controversy when the line of the company's road
was definitely fixed.

Another question of no little importance arises from the fact
found in the record, that, while Miller made his homestead entry
July 25, 1866, and entered upon the land within the time pre-
scribed by law, erected a house on it, and brought his family to
live on it, and made the tract his home until the spring of 1870,
he afterwards abandoned his homestead claim, and bought the
land of the railroad company, and paid for it, and sold the land
and transferred the certificate of sale to Dunmeyer, who
obtained the conveyance from the company. After all this
Miller's homestead entry was cancelled, no doubt with Dun-
meyer's consent, and G. B. Dunmeyer made a homestead entry
which the land department held to be valid.

It is argued by the company that, although Miller's home-
stead entry had attached to the land, within the meaning of
the excepting clause of the grant, before the line of definite
location was filed by it, yet when Miller abandoned his claim,

so that it no longer existed, the exception no longer operated, and the land reverted to the company—that the grant by its inherent force reasserted itself and extended to or covered the land as though it had never been within the exception. .

We are unable to perceive the force of this proposition. The land granted by Congress was from its very character and surroundings uncertain in many respects, until the thing was done which should remove that uncertainty, and give precision to the grant. Wherever the road might go, the grant was limited originally to five sections, and, by the amendment of 1864, to ten sections on each side of it within the limit of twenty miles. These were to be odd-numbered sections, so that the even-numbered sections did not pass by the grant. And these odd-numbered sections were to be those " not sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead right had not attached at the time the line of said road is definitely fixed." When the line was fixed, which we have already said was by the act of filing this map of definite location in the General Land Office, then the criterion was established by which the lands to which the road had a right were to be determined. Topographically this determined which were the ten odd sections on each side of that line where the surveys had then been made. Where they had not been made, this determination was only postponed until the survey should have been made. This filing of the map of definite location furnished also the means of determining what lands had previously to that moment been sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim had attached; for, by examining the plats of this land in the office of the register and receiver, or in the General Land Office, it could readily have been seen if any of the odd sections within ten miles of the line had been sold, or disposed of, or reserved, or a homestead or pre-emption claim had attached to any of them. In regard to all such sections they were not granted. The express and unequivocal language of the statute is that the odd sections *not* in this condition are granted. The grant

is limited, by its clear meaning, to the other odd sections, and not to these.

No attempt has ever been made to include lands reserved to the United States, which reservation afterwards ceased to exist, within the grant, though this road, and others with grants in similar language, have more than once passed through military reservations for forts and other purposes, which have been given up or abandoned as such reservations, and were of great value. Nor is it understood that, in any case where lands had been otherwise disposed of, their reversion to the government brought them within the grant.

Why should a different construction apply to lands, to which a homestead or pre-emption right had attached? Did Congress intend to say that the right of the company also attaches, and whichever proved to be the better right should obtain the land?

The company had no absolute right until the road was built, or that part of it which came through the land in question. The homestead man had five years of residence and cultivation to perform before his right became absolute. The pre-emptor had similar duties to perform in regard to cultivation, residence, &c., for a shorter period, and then payment of the price of the land. It is not conceivable that Congress intended to place these parties as contestants for the land, with the right in each to require proof from the other of complete performance of its obligation. Least of all is to be supposed that it was intended to raise up, in antagonism to all the actual settlers on the soil, whom it had invited to its occupation, this great corporation, with an interest to defeat their claims, and to come between them and the government as to the performance of their obligations.

The reasonable purpose of the government undoubtedly is that which it expressed, namely, while we are giving liberally to the railroad company, we do not give any lands we have already sold, or to which, according to our laws, we have permitted a pre-emption or homestead right to attach. No right to such land passes by this grant. No interest in the railroad company attaches to this land or is to be founded on this

statute. Such is the clear and necessary meaning of the words that there is granted every alternate section of odd numbers to which these rights have not attached. It necessarily means that, if such rights have attached, they are not granted.

Though the precise question here presented may not have been previously decided by this court, we are of opinion that the principles which should govern it have been acted on in other cases.

In *Newhall* v. *Sanger*, 92 U. S. 761, the Western Pacific Railroad Company, which by subsequent legislation of Congress became entitled to the benefits of the acts of 1862 and 1864, already discussed, having filed a map of definite location, obtained from the United States a patent for lands supposed to be included in its grant. The land in controversy, however, was within the boundaries of a claim under a Mexican grant, which had been regularly presented and prosecuted by appeal, and was finally rejected February 13, 1865. The line of the route of the company's road had been filed before this, and the order withdrawing the land from private entry had been made.

The argument in favor of the company was, that the decision that the Mexican claim was invalid restored the land to the operation of the grant to the railroad company, and that the patent issued to the company was valid. But the court held that the land never became subject to the grant, and that the holder of a subsequent patent from the United States had the superior title.

A similar decision was made at the same term in the case of the *Leavenworth, Lawrence and Galveston Railroad Co.* v. *United States*, 92 U. S. 733, to the effect that the purchase by the United States of Osage lands of the Indians, after a similar grant to that company, did not make it subject to the grant of 1863 of every alternate section along the line of the road.

It is said that the case of the *Water and Mining Co.* v. *Bugbey*, 96 U. S. 165, should control the decision of this, and undoubtedly there are some analogies between them.

That case grew out of the act of Congress of March 3, 1853, 10 Stat. 244, which, in providing for the system of surveying

and disposing of the government lands in California, gave to that State, as it had done to others, every sixteenth and thirty-sixth section of a township for school purposes. No public surveys had at that time been made, and there was no probability that they could be made as fast as the tide of emigration would fill the country with settlers on these lands. To encourage these settlers and protect them against this grant of the school lands, it was provided in that act " that where any settlement by the erection of a dwelling-house, or the cultivation of any portion of the land, shall be made upon the sixteenth or thirty-sixth sections, before the same shall be surveyed, or where such sections may be reserved for public uses or taken by private claims, other land shall be selected by the proper authorities of the State in lieu thereof." 10 Stat. § 7, 247.

Bugbey had made a settlement on one of these sections, and was there when the survey of the land was completed, May 19, 1866, but he never made any declaration of that fact or sought to establish any right by reason of this settlement under the act of 1853, or under the general pre-emption law, and the register of the land office certified to the State land office, on the 28th of September, 1866, that no claim had been filed to this section sixteen, except by one Hancock, afterwards abandoned.

On the 22d of April, 1867, Bugbey purchased of the State the part of the section on which the premises in controversy in that suit were situated, and took a patent for it.

An act of Congress of July 26, 1866, 14 Stat. 251, gave the right of way for ditches and canals in all public lands when they were recognized by local customs, laws and decisions of the courts, and the water and mining company, having run their canal through this land, asserted the right to do so under this statute, which Bugbey resisted. This court said that, if the title to the land was in the United States at the passage of the act of July 26, 1866, it conferred the right claimed as against Bugbey, who purchased of the State in 1867. But it further held that the title was then in the State of California, for the reason that Bugbey had never asserted any claim as a pre-emptor, but had recognized the right of the State, and purchased of the State and was then relying on its patent.

The reasoning of the court was not elaborated, but it is clear, by its reference to the case of *Buick* v. *Sherman*, 93 U. S. 209, which it distinguishes from Bugbey's case by showing that Buick had prosecuted his right of pre-emption by asserting and perfecting his claim in the United States Land Office, that Bugbey's failure to assert, at any time or in any place, any right growing out of his settlement on the land prevented the mining company from asserting that the title was in the United States when the act of July 26, 1866, was enacted. It passed by the statute of 1853 to the State, and was ascertained to be a sixteenth section by the survey, the filing of which perfected the title to the State, unless a right of pre-emption was asserted and proved to be in existence at that time. No such claim was ever made and the title passed to the State.

In the case before us a claim was made and filed in the land office, and there recognized, before the line of the company's road was located. That claim was an existing one of public record in favor of Miller when the map of plaintiff in error was filed. In the language of the act of Congress this homestead claim had *attached* to the land, and it therefore did not pass by the grant.

Of all the words in the English language, this word *attached* was probably the best that could have been used. It did not mean mere settlement, residence, or cultivation of the land, but it meant a proceeding in the proper land office, by which the inchoate right to the land was initiated. It meant that by such a proceeding a right of homestead had fastened to that land, which could ripen into a perfect title by future residence and cultivation. With the performance of these conditions the company had nothing to do. The right of the homestead having attached to the land it was excepted out of the grant as much as if in a deed, it had been excluded from the conveyance by metes and bounds.

The difference in the two cases is obvious.

*The judgment of the Supreme Court of the State of Kansas is affirmed.*