OREGON AND CALIFORNIA RAILROAD COMPANY
*v.* UNITED STATES. No. 3.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 188.  Argued March 4, 1903.—Decided May 4, 1903.

While a railway grant does not attach to lands which, at the time of the definite location of the line, have been sold, preëmpted, reserved or otherwise disposed of by the United States, this rule does not apply to a claim which has been cancelled or abandoned before the attachment of the railroad grant, either by the definite location of the line or by the selection of the lands as lieu lands within the indemnity limits. Where, therefore, a notification had been filed under the Oregon Donation Acts of September 27, 1850, and February 14, 1853, to land within the indemnity limits of a railroad land grant, but the person filing the same did not comply with the conditions of the statutes, the land continued to be the property of the United States to which the railroad grant subsequently attached, and the grant was not defeated by the fact that the donation notification remained of record in the office of the surveyor general.

If any presumption was created by the existence of the donation certificate to the effect that the land was reserved, the railroad may defeat the presumption by showing the actual facts in the same manner as an individual might who desired to enter the land on his own account. *Oregon & Cal. R. R. v. United States, No. 1,* 189 U. S. 103; and *Same v. Same, No. 2,* 189 U. S. 116, distinguished.

THIS was a bill in equity filed by the United States, in the Circuit Court for the District of Oregon, to compel a reconvey-

ance by the railroad company, as the successor and assignee of the Oregon Central Railroad Company, of certain lands within the indemnity limits of the land grant to such company of July 25, 1866, 14 Stat. 239, for which land one John W. Hines, on November 22, 1853, seventeen years before the definite location of the line of the road, had filed a donation notification under the Oregon Donation Act of September 27, 1850, 9 Stat. 496, and the act of February 14, 1853, 10 Stat. 158, amendatory thereof. These lands the President of the United States on July 12, 1871, patented to the railroad company by an alleged mistake and without the knowledge of the adverse claim of Hines. By reason of this prior donation the patent was averred to be void, and its cancellation was prayed under the act of March 3, 1887, 24 Stat. 556, authorizing the Attorney General to institute necessary proceedings to cancel patents erroneously issued to railroad companies.

The defendant in its plea averred an approval of its map of definite location January 29, 1870, a selection of the lands prior to July 12, 1871, and the further facts that Hines abandoned the land without having paid for it, or resided thereon four years, and that he was not residing thereon at the time the defendant selected the same.

The Circuit Court decreed the cancellation of the patent, and the Court of Appeals affirmed the decree.

*Mr. Maxwell Evarts* for appellant.

*Mr. Special Assistant Attorney General Russell* for appellee.

Mr. JUSTICE BROWN, after making the foregoing statement, delivered the opinion of the court.

This case is similar to two recent cases bearing the same title, in the first one of which, 189 U. S. 103, a patent of certain lands within the indemnity limits of the same road, dated February 20, 1893, was cancelled in favor of certain entrymen under the homestead laws of the United States, who had settled upon these lands at sundry dates from 1869 to

1890, and before the defendant company had selected the lands in question as indemnity lands or had received a patent. The court found that "when the company's lists were approved neither the Commissioner nor the Secretary had any knowledge of the adverse claims of the settlers to the lands upon which they respectively resided;" and held that the land department had no authority, simply upon the definite location of the road, to withdraw from the operation of the pre-emption and homestead laws lands within *its indemnity* limits, and that such order did not prevent an occupancy by home-stead settlers *within such limits* up to the time of the approval of the selection made by the railroad company of lieu lands, and that, as it appeared the lands were actually occupied by homestead settlers at the time they were selected by the railroad company, such lands were not open to selection, although such selection was prior to the application of the settlers for entry under the homestead laws. It appeared in the case that the settlers had moved with due diligence to perfect and protect the right acquired by their occupancy of the lands, but were unable to obtain formal entry of the same, because the lands had not been surveyed. "At the time the settler went upon the land, in good faith, to make it his home and to perfect his title under the homestead laws, there was nothing of record that stood in the way of his right to occupy the lands and to remain thereon until he could perfect his title by formal entry under the homestead laws."

The second case was like unto the first, except that there had been a long delay by the land department in having the land surveyed. It was held that the land department had acted "with all convenient speed" within the meaning of the act of 1870, 16 Stat. 94, sec. 2, making the land grant. 189 U. S. 116.

In both of these cases, however, the lands were in actual occupation of settlers under the homestead laws at the time selection was made by the railroad company and the patents issued.

In this case the settlement was made under the Oregon Donation Act, 9 Stat. 496, the fourth section of which enacts that "there shall be, and hereby is, granted to every white

settler or occupant of the public lands, . . . who shall
have resided upon and cultivated the same for four consecutive
years, and shall otherwise conform to the provisions of this act,
the quantity of one half section, or three hundred and twenty
acres of land," etc.; and by the first section of the amendatory
act of 1853, 10 Stat. 158, it was provided that settlers under
the former act, in lieu of the term of continued occupation after
settlement, as provided by said act, shall be permitted, after
occupation for two years of the land so claimed, to pay into
the hands of the surveyor general of said Territory at the rate
of $1.25 per acre of the land so claimed. The plea alleges that
Hines abandoned the land without having paid for it under the
act of 1853, or residing on it for four years under the original
act; and the case turns upon the question whether, by the
mere filing of the donation notification in 1853, and the subse-
quent abandonment of the lands, they fall within the category
of those which had been " granted, sold, reserved, occupied by
homestead settlers, preëmpted, or otherwise disposed of," within
the meaning of the act of July 25, 1866, granting lands for the
construction of this road. Clearly the lands do not fall literally
within either of the above designations, and unless a claim ex-
isting of record to the lands—which claim had in fact been
abandoned for fifteen years—operates to prevent the selection
of such lands by the railroad company, such company takes a
good title to them.

That a railway grant does not attach to lands which at the
time of the definite location of the line have been sold, pre-
empted, reserved or otherwise disposed of by the United States
for any purpose, has been so often decided by this court as to
be no longer open to question. *Leavenworth &c. R. R. Co.* v.
*United States,* 92 U. S. 733; *Newhall* v. *Sanger,* 92 U. S. 761;
*Doolan* v. *Carr,* 125 U. S. 618; *United States* v. *McLaughlin,*
127 U. S. 428; *Cameron* v. *United States,* 148 U. S. 301; *Carr*
v. *Quigley,* 149 U. S. 652. These cases, however, merely apply
the language of the statutes to variant circumstances. Neither
of them turns upon the effect of a claim which has been can-
celled or abandoned before or after the attachment of the rail-
road grant, either by the definite location of the line or by

the selection of the lands as lieu lands within the indemnity limits.

That question was first considered in *Kansas Pacific R. R. Co.* v. *Dunmeyer*, 113 U. S. 629, 639, which involved the title to part of an odd-numbered section within the place limits of the Union Pacific Railroad Company's grants of 1862, 1864 and 1866. The facts were that one Miller made a homestead entry upon this section July 20, 1856, which was valid if the land was then public land. The line of definite location was filed September 21, 1866, so that the entry of Miller brought the land within the exception in the grant as land to which the homestead claim attached at the time the line of the road was definitely fixed. It was argued by the company that, although the homestead entry had attached to the land, and Miller had entered upon it within the time prescribed by law, erected a house upon it, and brought his family to live upon it, and made the tract his home until the spring of 1870, yet that he afterwards abandoned his homestead claim, bought the land from the railroad company, and paid for it, and sold the land to Dunmeyer, who had obtained a conveyance from the company. From this it was argued that the exception no longer operated and the land had reverted to the company. But it was held that, as Miller's claim was an existing one of public record when the railroad map was filed, it was excepted from the land grant, notwithstanding the subsequent abandonment. The case is readily distinguishable from the one under consideration in the fact that Miller had not only entered upon the land, but was in actual possession of it at the time of the definite location of the road, and that he did not abandon his entry until nearly four years after the line of definite location was filed.

A case not dissimilar is that of *Bardon* v. *Northern Pacific Railroad*, 145 U. S. 535. That case arose from a land grant to the Northern Pacific Company of July 2, 1864, 13 Stat. 365, under which act the company proceeded to designate the general route of its road, and afterwards to have its line definitely fixed. The date when the line was definitely fixed is not stated in the report, and is not treated as material, but it appears that on September 12, 1855, one Robinson settled upon the land, filed

his declaration under the preëmption laws, but died without filing proof or paying the government for the land. On August 5, 1865, this preëmption claim was cancelled for alleged failure to furnish proof of continuous residence prior to July 30, 1857. It was held that, as it appeared the premises had been taken up on the preëmption claim of Robinson before the railroad grant took effect, and that the cancellation had not then been made, nor for more than a year afterwards, such cancellation of the preëmption entry did not restore it to the public domain so as to bring it under the operation of previous legislation which applied to land *then* public.

In the consideration of the present case we are not embarrassed by either of these adjudications, since in one case the lands were not only actually occupied by the homestead claimant at the time the railroad grant took effect, but in both cases the proof of such occupation was of record in the proper office, and the lands were abandoned in one case, and the certificate cancelled in the other after that date, while in this case the land was abandoned fifteen years before the lands were selected by the company, and nothing remained to indicate that the land was reserved, except the donation notification in the office of the surveyor general.

Two other cases are more directly in point. In *Hastings &c. R. R. Co.* v. *Whitney*, 132 U. S. 357, the grant was made to the railroad July 4, 1866, and the line definitely located March 7, 1867. In May, 1865, one Turner applied, through his attorney, to enter the land in question as a homestead. The affidavit did not state that Turner's family, or any member thereof, was residing on the land, or that there was any improvement thereon, and, as a matter of fact, no member of his family was residing, or ever did reside, on said land, and no improvement was made thereon by any one. The entry was allowed and stood upon the records of the land office uncancelled until September 30, 1872, when the entry was cancelled. The land was subsequently, in 1877, entered by Whitney as a homestead and a patent delivered. It was held that the homestead entry of Turner excepted it from the operation of the land grant, notwithstanding the entry was invalid on its face. "So long as it

remains a subsisting entry of record, whose legality has been passed upon by the land authorities, and their action remains unreversed, it is such an appropriation of the tract as segregates it from the public domain, and therefore precludes it from subsequent grants."

In *Whitney* v. *Taylor*, 158 U. S. 85, one Jones, in May, 1854, settled upon a quarter section of public land in California, and as soon as the land was surveyed (in 1857) declared his intention to claim it as a preëmption right, paid the fees required by law, and caused notice of the same to be filed in the proper government record. He occupied the tract until 1859, when he left for England and never returned. The land was found to be within the place limits of the grant to the Central Pacific Railroad Company of 1862. This company filed its map of definite location in 1864, and demanded the section in question. In 1885 the preëmption entry of Jones was cancelled. It was held that the tract, being subject to the claim of Jones at the time when the grant to the railroad company took effect, was excepted from the operation of that grant, and that after the cancellation of that entry it became part of the public domain, and that such cancellation did not enure to the benefit of the railroad company.

The latest case upon the subject, however, is that of the *Northern Pacific Railway* v. *De Lacey*, 174 U. S. 622. In that case the railroad company had filed its map of definite location March 26, 1884. On April 9, 1869, one John Flett filed a declaratory statement of his intention to purchase the land under the preëmption laws. In the fall of the same year, Flett left the land and did not thereafter reside on the same, although it appears that, in September, 1870, he went to the local land office and told the officers that he had come to prove his claim. He was told that he had lost it, as it had become railroad land. He acquiesced in this statement. In 1887, eighteen years after his original entry, Flett submitted proof in support of his preëmption claim, founded upon his declaratory statement. A hearing was had in the presence of all the parties, which finally resulted in a decision of the Secretary of the Interior, September 28, 1891, awarding the land in contro-

versy to the railroad company. Flett's declaratory statement was not formally cancelled upon the records until December 23, 1891. A suit brought in the Circuit Court by the railroad company resulted in its favor, but the decree was reversed by the Court of Appeals, and the case brought here for review.

It was contended that at the time, March 26, 1884, when the map of definite location was filed, the declaratory statement of Flett, filed in the local land office in 1869, remained there as a record, and was an assertion of a preëmption claim, and that under the case of *Whitney* v. *Taylor*, above cited, the land described in that statement was excepted from the grant to the railroad company. The question was presented whether the proceedings in the case of Flett were of such a character as to prevent the grant to the company from taking effect at the time of filing its map of definite location, March 26, 1884. It was held that, under the second section of the act of July 14, 1870, 16 Stat. 279, claimants of preëmption rights must make proper proof and payment of the lands claimed within eighteen months after the date prescribed for filing their declaratory notices shall have expired; that under the joint resolution of March 3, 1871, 16 Stat. 601, twelve months in addition to that provided in the first act were given to the claimants to make proof and payment; that, adding the eighteen months given by the first act to the twelve months given by the second act, all claimants of preëmption rights were given thirty months to make the proper proof and payment for the lands claimed, and that " whether such proof and payment were made would be matter of record, and if they were not so made the original claim was cancelled by operation of law, and required no cancellation on the records of the land office to carry the forfeiture into effect. The law forfeited the right and cancelled the entry just as effectually as if the fact were evidenced by an entry upon the record." The case of *Whitney* v. *Taylor* was distinguished upon the ground that, in that case, " there was no period within which a preëmptor was compelled to prove up and pay for his claim, except that it should be done before the land was offered at public sale by the proclamation of the President." It was held that, as the thirty months allowed

to Flett had expired years before the filing of the map of
definite location, there was no existing claim at that time, and
that the grant of the railroad company took effect. "There-
after there was no claim, for it had ceased and determined,
and with reference to the right it was of no more validity
after the expiration of that time than if the statement had
never been filed."                               :

Recurring now to the case under consideration, it appears
that by the sixth section of the Oregon Donation Act, 9 Stat.
498, it was incumbent upon the settler to notify the surveyor
general, within three months from the commencement of his
settlement, of the precise tract claimed by him; and by section
seven, within twelve months from the time the settlement com-
menced, must prove to the satisfaction of the surveyor general
that the settlement and cultivation required by the act had
been commenced, and that at any time after the expiration of
four years from such settlement he might prove the fact of con-
tinual residence and cultivation required by the fourth section,
when upon such proof being made, the surveyor general issues
the proper certificate, forwards the same to the Commissioner
of the General Land Office, whose duty it is to issue patents for
the land.

It is true that by the act of July 26, 1894, 28 Stat. 123, where
proof of settlement had been made under the donation acts
and notice given as required by law, but there had been a fail-
ure to execute and file in the land office proof of continued
residence and cultivation of the land so settled upon, so as to
entitle the donees to patents, such claimants, their heirs, de-
visees, assigns and grantees, were given the right until Jan-
uary 1, 1896, "to make and file final proofs and fully establish
their rights to donations" under the aforesaid act of Congress,
and upon failure to do so they were to be held to have aban-
doned their claims. But by section two of the same act the
Commissioner of the Land Office was given the right, if such
right existed, "to allow or direct hearings to be instituted to
show that a donation claimant has abandoned the lands de-
scribed in his notice, or prevent the Commissioner, when it is
proven that such a claim is invalid or abandoned, from cancel-·

ling the same upon the official records, and thereafter disposing
of the land as a part of the public domain ; " and by section
three, " nothing in this act contained shall be construed to im-
pair or affect any adverse claims arising under any law of the
United States other than said donation act, to or in respect of
the lands in this act referred to."

It is entirely clear that the position of the government in this
case is not strengthened by anything contained in this act, since
it was intended only for the relief of those who had resided
continuously upon and cultivated the lands specified in the
original donation notification, but had through mistake or neg-
ligence omitted to make and file their final proofs and fully es-
tablish their rights to such donations.  Such donees were given
until January 1, 1896, to make such final proof and obtain their
patents ; but they were not given thereby the right to perfect
their claims to lands which they had abandoned before com-
pleting a continued residence of four years thereon.  This in-
ference is rendered only the more clear by the second section,
which authorizes the Commissioner, when it is proved that
such claim is invalid or abandoned, to cancel the same upon
the official records, and by the third section, which expressly
saves adverse claims arising under any law other than the
donation act.

It is clear that title to the land here in question never passed
from the United States under the donation acts of 1850 and
1853, since the donation was only made to those " who shall
have resided upon and cultivated the same for four consecutive
years, and shall otherwise conform to the provisions of this act."
*Hall* v. *Russell*, 101 U. S. 503 ; *Maynard* v. *Hill*, 125 U. S.
190.  As these conditions were never complied with, the land
continued to be the property of the United States, to which the
railroad grant subsequently attached, unless such grant was
defeated by the fact that the donation notification still remained
of record in the office of the surveyor general.  As the land
had neither been " granted, sold . . . occupied by home-
stead settlers, preëmpted, or otherwise disposed of," the bill
can only be sustained upon the ground that at the time land
was selected it was " reserved " from sale.  But for what pur-

pose was it reserved? Not for the donation settler, since he had abandoned the land fifteen years before; not for the United States, since every possible encumbrance had been removed from it, and it had lapsed into its original condition of public land, open to preëmption or sale. It is true the donation notification had not been formally cancelled, but the donation acts made no provision for such cancellation, although it may, perhaps, have been within the power of the land department to take such action even prior to the act of 1894. This, however, was not done, and the land might have remained in that condition permanently, had not some other person applied to enter or purchase it by showing that it had been abandoned by the original donee. But, if this may be done by an individual preëmptor, why may not a railroad company do the same thing by claiming the land under its grant, and showing in defence to this suit that it had actually been abandoned? It may be said that presumptively the land had been reserved, as shown by the donation notification, and for aught that appeared the donee might still be in possession, but we know of no reason why the railroad company may not show the actual facts as well as an individual who might desire to enter the land upon his own account. Even admitting that the donation notification was on file in the office of the surveyor general, there was no proof, required by section seven of the act to be filed within twelve months from the time of settlement, that the settlement and cultivation required by the act had been commenced; nor after the expiration of four years from such settlement was there any proof of continual residence or cultivation, required by the same section. The record which informed the company that the land had been settled by a donee also apprized it that the provision of the statute had not been complied with. We think that, considering the fact that fourteen years had elapsed since the original settlement, the railroad company would be authorized to infer that the donee had abandoned the land, as in fact appears to have been the case. Under the facts of this case we think the lands were not reserved within the meaning of the granting act.

But even if the position of the government be correct and

the patent be subject to cancellation, we see nothing to prevent. the railroad company from again selecting the same land to make good its losses within the limits of its primary grant, no intermediate rights being shown to have accrued.   If such be the fact, it would be useless to direct the cancellation of the patent, as it would become the duty of the land department to issue immediately a new one for the same property.   *Germania Iron Company* v. *United States,* 165 U. S. 379; *United States* v. *Central Pacific Railroad Company,* 26 Fed. Rep. 479.

> *The decrees of the courts below are therefore reversed and the case remanded to the Circuit Court for the District of Oregon with directions to dismiss the bill.*

Mr. Justice McKenna, having filed the bill in this case as Attorney General, did not participate in this decision.