UNITED STATES v. GRAND RAPIDS & I. R. CO. et al.

(Circuit Court of Appeals, Sixth Circuit.  November 23, 1908.)

No. 1,775.

1. Public Lands (§ 75*)—Railroad Grant—Construction—Lands Excepted.
The grant of lands to the state of Michigan to aid in the construction of railroads by Act June 3, 1856, c. 44, 11 Stat. 21, was a grant in præsenti, and under the exception of "any and all lands heretofore reserved to the United States by any act of Congress or in any other manner by competent authority for the purpose of aiding in any object of internal improvement or for any other purpose whatsoever," applied only to public lands such as were then subject to grant as not at the time withdrawn from sale or entry for any purpose whatever, and that certain lands then under reser-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

vation subsequently became public lands, subject to grant, entry, or sale, did not have a retroactive effect, so as to bring them within the grant.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 238; Dec. Dig. § 75.*]

2. TREATIES (§ 9*)—TIME OF TAKING EFFECT—PRIVATE RIGHTS.

While it is a principle of international law that a treaty takes effect by relation as of the date it was signed, although not ratified until later, this is only so as between the contracting nations; and private rights are not affected by such a treaty until it is ratified, for then only, under the Constitution, does it become the law of the land.

[Ed. Note.—For other cases, see Treaties, Cent. Dig. § 9; Dec. Dig. § 9.*]

3. PUBLIC LANDS (§ 120*)—RAILROAD GRANT—SUIT BY UNITED STATES TO CANCEL PATENTS—RIGHT TO EQUITABLE RELIEF.

Certain public lands, which were conditionally reserved from sale or entry for the purposes of a pending Indian treaty at the date of a railroad grant, and which did not pass thereunder, were nevertheless, in accordance with the then existing construction of such grants by the land department, certified and patented as part of the grant; the lands having been withdrawn from the reservation at the time the railroad line was definitely located. Both parties assumed that the lands were properly covered by the grant for several years, during which time they were sold by the railroad company to innocent purchasers for value, and the government made no other disposition of them. After the filing by the railroad company of the map of the definite location of its line, which brought such lands within the place limits of the grant, the United States disposed of a greater quantity of lands within the indemnity limits which were available to the company in lieu of the lands in question, and the company failed to obtain its full quota of land because of a deficiency existing on a part of its line to the extent of five times the quantity of land in question. Held that, conceding such land to have been erroneously certified and patented, the United States was not entitled in equity to a cancellation of the patents, or to recover the minimum government price thereof from the railroad company, under Act March 3, 1887, c. 376, 24 Stat. 556 (U. S. Comp. St. 1901, p. 1595).

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 332; Dec. Dig. § 120.*]

Appeal from the Circuit Court of the United States for the Western District of Michigan.

For opinion below, see 154 Fed. 131.

The facts are so well and correctly stated by Judge Knappen, who heard this case in the Circuit Court, that we set out below and adopt that part of his opinion as our statement of the case.

The bill in this cause was filed February 20, 1896, by the Attorney General of the United States under the act of March 3, 1887, providing for the adjustment of land grants made by Congress to aid in the construction of railroads and for the forfeiture of unearned lands (24 Stat. 556, c. 376 [U. S. Comp. St. 1901, p. 1595]), and for the cancellation of patents for 20,276.66 acres of land in the counties of Charlevoix and Emmet, Mich., certified by the United States to the state of Michigan, and conveyed thereunder to the Grand Rapids & Indiana Railroad Company, and for the recovery of the minimum government price of $1.25 per acre for such of the lands as shall be found to have been conveyed by the railroad company to innocent purchasers. The facts are these:

In April, 1855, the Ottawa Indians, living in and about Little Traverse Bay, Mich., were negotiating a treaty with the United States, by which the former were seeking to obtain some government lands in Emmet and Charlevoix counties in exchange for lands west of the Mississippi river which had been set apart for these Indians under a former treaty. The Commissioner of Indian Affairs, through the Commissioner of the General Land Office and the

Secretary of the Interior, requested the President that certain designated townships and fractional townships be withheld from sale "until it shall be determined whether the same may be required for said Indians." The order of withdrawal was made May 14, 1855, in terms, "with the express understanding that no peculiar or exclusive claim to any of the lands so withdrawn can be acquired by said Indians, for whose future benefit it is understood to be made, until after they shall, by future legislation, be invested with the legal title thereto." The Land Commissioner accordingly notified the register and receiver of the local land office of the President's order, and under the Commissioner's direction the lands covered by the order of withdrawal were marked by the register on his tract book "Lands Withdrawn from Sale and Withheld for Indian Purposes, Conditionally, by Order of the President of May 14, 1855."

The lands here involved are but a small part of the lands so conditionally withdrawn. The contemplated treaty (which embraced certain tribes of Chippewas, as well as Ottawas) was concluded and signed at Detroit by the commissioners of the United States and by the chiefs and head men of the Indians on July 31, 1855. 11 Stat. 621. It provided, among other things, for the withdrawal from sale for the benefit of the Indians of certain specified lands, and dissolved the tribal organization of the Ottawa and Chippewa Indians, except so far as might be necessary for carrying into effect the new treaty. The lands involved here were excluded from the treaty, and have never been used or disposed of by the United States, except as they were later conveyed to the Grand Rapids & Indiana Railroad Company under the railroad aid grant later referred to. The Land Commissioner, upon the signing of the treaty, at once and on August 1, 1855, from Detroit, notified the Acting Land Commissioner at Washington of the conclusion of the treaty, giving in detail the descriptions of land embraced in it, and instructed that withdrawal be had of all the lands so described in the treaty, for the purpose of enabling the Indians "to select the quantity of lands guaranteed to them by said treaty," and that proper proclamation be made and notice to the land office be given "to avoid difficulties that might occur by entries being made within said boundaries." This treaty was ratified by the Senate (with certain amendments) on April 15, 1856. 11 Stat. 629.

On June 3, 1856 (11 Stat. 21, c. 44), after the conclusion and ratification of the treaty, and the permanent exclusion from its operation of the lands here in controversy, but before the Senate amendments had been assented to by the Indians, the United States granted to the state of Michigan, in aid of the construction of certain railroads in that state, including a railroad "from Grand Rapids to some point on or near Traverse Bay," upon the then usual conditions for conveyance from time to time as the building of the road progressed and for government use of the railroad, every odd-numbered section for six miles on each side of the proposed line of railroad, with fifteen-mile indemnity limits in lieu of such lands within the six-mile limits as should be sold or pre-empted before the railroad lines should be definitely fixed. The state of Michigan accepted the grant February 14, 1857, and designated the Grand Rapids & Indiana Railroad Company as the beneficiary. Meanwhile, in July, 1856, the Indians ratified the amendments made by the Senate to the treaty, and the latter, as so amended, was, on September 10, 1856, duly proclaimed by the President. 11 Stat. 629. On February 28, 1857, the railroad grant was formally accepted by the railroad company in writing. The acceptance by both the state and the railroad company was thus after the final ratification of the amended treaty, by the making of which treaty the condition upon which the lands here in question were reserved had failed.

The railroad map of definite location was filed with the Secretary of State for Michigan on November 23, 1857, and with the United States Land Commissioner on July 11, 1858. June 7, 1864, Congress amended the grant of June 3, 1856, by including within the terms of the grant the line from the southern boundary of Michigan to Grand Rapids; the indemnity limits being extended from 15 miles, as in the act of 1856, to 20 miles. 13 Stat. 119, c. 110. This extension of the indemnity limits was evidently made by reason of the fact that comparatively little public land remained within either the 6 or 20-mile limits south of Grand Rapids. This extension amendment was accepted by the state March 10, 1865 (Laws Mich. 1865, p. 241, No. 131), and by the railroad company February 22, 1866. The map of the extended line was filed with the state

authorities May 10, 1866, and with the Commissioner of the General Land office May 25, 1866.

The railroad company fully performed the terms of its agreement under the grant, including the building of the railroad, which was finished by November 25, 1873, and within the time provided by the original congressional and state acts and the subsequent extension acts; and the lands in controversy were accordingly, during the years 1871 and 1874, certified (with other lands) to the state by the Commissioner of the General Land Office, with the approval of the Secretary of the Interior, and upon the certificate of the register and receiver of the Government Land Office to the applicability of the lands to the grant and their freedom from adverse claims.

The order of May 14, 1855, conditionally withdrawing the lands in question from sale, was never in express terms revoked, but from the time of the making of the Indian treaty until 1887 (several years after the last of the lands had been patented to the railroad company) the making of the treaty was by numerous acts of the President and land officers impliedly and practically construed to be a revocation and termination of the withdrawal as to lands not embraced therein, and the railroad grant was accordingly construed and recognized as including all lands within its general terms which were not in fact expressly required by the terms and for the purposes of the treaty as actually made. In 1874, after a portion of the lands in question had been certified, the question of the right of the railroad company to the lands in controversy was distinctly raised, and after careful consideration the Commissioner of the General Land Office made the express holding, approved by the Secretary of the Interior, that the treaty in question extinguished the Indian claim, and restored to public domain the lands conditionally withdrawn by the order of May 14, 1855, so as to bring them within the grant of June 3, 1856, and under the then existing view that the status of the land at date of definite location governed the lands were accordingly certified to the state and patented to the railroad company. In 1887 the right of the railroad company to these lands was denied through a decision of the Secretary of the Interior, in the case of the Jackson, Lansing & Saginaw Railway Company, whose rights were similarly affected by the withdrawal of May 14, 1855, and the grant of June 3, 1856.

The total of the lands actually received by the Grand Rapids & Indiana Railroad Company, under both grants, lacked 101,852.73 acres of the amount contained within the 6-mile limits of the grant; this failure resulting from the fact that the amount within the 20-mile limits north of Grand Rapids available for the purpose was not sufficient to make up the deficit in the southern portion. There is included in the amount stated more than 23,000 acres disposed of by the United States since the extension amendment of 1864, by way of pre-emption, sales, and homestead entries, otherwise available to the railroad company under its grants. The railroad company presented a claim to the Interior and Treasury Departments for reimbursement on account of these failures in its land grant, which claim was disallowed. The proofs show that the railroad company received the lands in controversy in good faith under its grant, and that it has sold all of said lands to innocent purchasers for value.

W. K. Clute, for appellant.

J. H. Campbell, for appellees.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge (after stating the facts as above). Confessedly the lands involved are within the place limits of the grant of June 3, 1856. 11 Stat. 21, c. 44. The contention of the government is that, although within the place limits of that grant, they did not pass under the grant, because excepted out of its operation by a proviso excepting—

"any and all lands heretofore reserved to the United States by any act of Congress, or in any other manner by competent authority, for the purpose of

aiding in any object of internal improvement, or for any other purpose whatsoever."

On May 14, 1855, these lands, with others, were withdrawn from sale or pre-emption by an order of the president for the purposes of pending treaty with the Chippewa Indians. This order had not been revoked when the grant of June 3, 1856, was made, nor, indeed, has it ever been formally revoked. Unless, therefore, the lands had been otherwise restored to the public domain as lands subject to sale and grant prior to June 3, 1856, the date of the land grant under which the railroad company claimed title, they did not pass under it and were excluded from its operation. The grant of June 3, 1856, was one in præsenti and was confined in terms to public lands; that is, lands then subject to grant as not at the time withdrawn from sale or entry for any purpose whatever. That this land in controversy subsequently became public land, subject to grant or sale or entry, does not have a retroactive effect, so as to bring it under the operation of the grant. Bardon v. Northern Pacific Railroad Company, 145 U. S. 535, 12 Sup. Ct. 856, 36 L. Ed. 806; United States v. Southern Pacific Railroad Company, 146 U. S. 570, 13 Sup. Ct. 152, 36 L. Ed. 1091; Northern Lumber Company v. O'Brien et al., 139 Fed. 614, 71 C. C. A. 598.

But the contention is that as these particular lands were reserved only for the purpose of the pending treaty and as that treaty designated other lands and omitted those in controversy, the reservation terminated by implication, without any formal withdrawal order before the date of the granting act. But it does not appear that the pending treaty had been concluded, so as to constitute the law of the land until after June 3, 1856. It is shown that a treaty had been signed by the commissioners representing the United States and the chiefs and head men of the Chippewa and Ottawa tribes on July 31, 1855, a date antecedent to the grant involved, and that that treaty specifically designated the public lands which should be set apart to satisfy the terms of the treaty and did not include the lands in controversy. That treaty so signed on July 31, 1855, provided that it should be obligatory "as soon as ratified by the President and Senate of the United States." This ratification by the Senate occurred April 15, 1856, but was made subject to certain amendments, which were not accepted by the last of the chiefs and head men of the Indians until July 31, 1856. Neither was this amended treaty confirmed or promulgated by the President until September 10, 1856. For the treaty and its ratification see 11 Stat. 621–629, inclusive.

While it is a principle of international law that a treaty takes effect by relation as of the date it was signed, although not ratified until later, this is only so as between the contracting nations. Private rights are not affected by such a treaty until it is ratified; for only then, under our Constitution, does it become the law of the land. This is a distinction well settled by the decisions. United States v. Arredondo, 6 Pet. 691, 748, 8 L. Ed. 547; Davis v. Parish of Concordia, 9 How. 280, 289, 13 L. Ed. 138; Haver v. Yaker, 9 Wall. 32, 19 L. Ed. 571; Shepard v. Life Insurance Co. (C. C.) 40 Fed. 341. That this treaty should not become effective until confirmed by the Senate

and by the President is plainly shown by the treaty itself. The President might accept it or reject it after such amendment. In fact, the Senate did amend it. That the amendment did not include the lands here involved, as lands out of which the Indian claims might have been satisfied, is not important. It was subject to alteration until ratified, so as to have designated these lands as lands out of which the Indians might make their selections. An implied revocation of the order reserving the lands to meet the purposes of the pending treaty did not arise so long as the treaty was subject to alteration. Until ratification, these lands continued to be segregated from the public lands and were not subject to grant.

It is next contended that this treaty had been duly signed and promulgated when a map of final location was filed, and if the land was public land at that date the grant attached. For the United States it has been urged that, if it be conceded that the reservation was impliedly canceled by reason of the designation of other land to carry out the purpose of the treaty, the fact is irrelevant, as lands excepted out of its terms, because reserved, do not subsequently pass under such a grant, although the reservation is withdrawn before the date of the location of the railroad. It is also contended for the government that the decision of the Land Department that the grant did attach when the reservation had been revoked by implication was an erroneous decision of law, not conclusive upon the government or the court. The question thus stated is an interesting one, and not free from doubt under the decided cases. Kansas Pac. Ry. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566, 28 L. Ed. 1122; Bardon v. Northern Pac. Ry. Co., 145 U. S. 535, 12 Sup. Ct. 856, 36 L. Ed. 806; Oregon Ry. Co. v. United States, 190 U. S. 186, 23 Sup. Ct. 673, 47 L. Ed. 1012.

But, in the view we entertain of another question, it is deemed unnecessary to decide it. Assuming, for the purposes of this case, that the grant of June 3, 1856, did not attach to these lands, because they were under a valid reservation at that date, it does not follow that the United States is entitled to any relief in a court of equity. The lands were in fact public lands when the railroad company filed its map of definite location, because the provisional reservation which existed at date of grant had then expired as a consequence of the appropriation by the concluded treaty of other lands to meet the purpose for which these lands had been reserved. Thereafter the railroad company, having constructed its railroad in the manner and within the time required by the grant, selected these lands as lands earned and asked that they be certified and patented to it. This claim was made upon the theory that, having become public land before the filing of the map of definite location by which the grant, which had before been a mere float, became a grant of specific land, they passed under the grant. The question was given careful consideration by the Commissioners of the Land Office, who ruled that the treaty had extinguished the reservation and restored the lands to the public domain, which had thereby been brought within the terms of the grant. The decision was approved by the Secretary of the Interior, and the

lands were accordingly certified to the state of Michigan and patented to the railroad company. If this was an erroneous decision of a matter of law, the courts are not concluded. Wisconsin Central Railroad v. Forsythe, 159 U. S. 47, 15 Sup. Ct. 1020, 40 L. Ed. 71.

That the contention of the railroad company for such a construction was made in good faith, and the decision of the department likewise in good faith, is not questioned. The ruling was in accord with the prior practice of the department, holding that the status of lands at the date of the filing of a map of definite location determined the lands to which the grant applied, thus disregarding their status at the date of the grant itself. Neither is it disputed but that the railroad company sold these lands in good faith to good-faith purchasers, who are now and have been for many years claiming and occupying them. The act of Congress under which this bill was filed confirms the title of such good-faith purchasers and limits the claim of the government, in such circumstances, to a recovery from the railroad company of the price of similar government lands. The government now concedes that under the facts of this case there can be no other relief. But this is a court of equity, and the government has applied to it as such, upon the theory that the railroad company, having received the price of these lands, should account to the government for such price to the extent of the selling price of similar lands, regardless of what it actually received. Does the case made entitle the government to this relief from a court of equity?

The Circuit Court found upon the facts, and in this we concur, that under both of the grants in which it was the beneficiary the railroad company had received 101,823 acres less than it had earned under its contract for the construction of the railroad aided by the grant. Of this shortage, 23,000 acres which the company might have received have been disposed of since the extension grant of 1864. In other words, the land available to satisfy the terms of the grant was more than 100,000 acres less than it expected to receive and the government expected to grant. Its claim, presented to the Departments of the Interior and Treasury, for compensation for the deficiency, was rejected. While it is true that Congress does not guarantee that there shall be a sufficient quantity of public lands subject to the grant to fulfill the expectations of the parties, yet, as said in Wisconsin Central Railroad Company v. Forsythe, 159 U. S. 47, 60, 15 Sup. Ct. 1020, 1025, 40 L. Ed. 71, where Congress makes—

"a grant of a specific number of sections in aid of any work of internal improvement, it must be assumed that it intends the beneficiary to receive the amount of lands specified, and, when it prescribes that the lands shall be alternate sections along the line of the improvement, it is equally clear that the intent is that, if possible, the beneficiary shall receive the particular sections."

This error, due to the mutual mistake of the railroad company and the government, by which these lands were certified and subsequently patented, has resulted in the loss of precisely that amount of land. But for this erroneous decision that these lands were available under the grant, other lands, then available, would have been patented, which other public land has since been otherwise disposed of by the govern-

ment. That these facts do not constitute such a claim as might be affirmatively asserted against the government may be conceded. That they may be the basis of an equitable defense against a claim for the price of lands so erroneously patented, when that claim is asserted in a court of equity, we have no doubt. This would be true if such a claim was presented by a private litigant, and it is no less true when the government comes into a court of equity for the relief it now asks. Equity will not lend its active assistance contrary to conscience and the plain justice of a case. United States v. Winona & St. Peter Railroad Co., 165 U. S. 463, 482, 17 Sup. Ct. 368, 41 L. Ed. 789; United States v. Detroit Lumber Co., 200 U. S. 322, 338 et seq., 26 Sup. Ct. 282, 50 L. Ed. 499.

In the Winona Case, cited above, the question arose under a bill similar to the one in the case under consideration. Failing to set aside and cancel the certification of the lands patented through mistake, the government sought a decree against the railroad company for the value of the lands erroneously certified. Mr. Justice Brown, for the court, said:

"It does not appear from this record either that the railroad company received an excess of lands or has even received (these lands included) the full quantity of lands promised in the grant; and, further, it does not appear that there were not within the granted or indemnity limits lands which the company might have rightfully received, but for this erroneous certification. It will hardly be contended that if simply through a mistake of the land department these lands were certified, when at the time other lands were open to certification which could rightfully have been certified, and which have since been disposed of by the government to other parties, so that there is now no way of filling the grant, the government can nevertheless recover the value of the lands so erroneously certified. In other words, the mistake of the officers cannot be both potent to prevent the railroad company obtaining its full quota of lands and at the same time potent to enable the government to recover from the company the value of the lands erroneously certified. Our conclusion, therefore, is that, upon the record as it is presented, the decree of the Court of Appeals was right, and it is affirmed."

The conclusion of the court below was rested upon this ground, and we are content to affirm it.